**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| Jasmyne Gramza, | ) | |
| | ) | No.  CV-20-01425-PHX-DLR |
|     Plaintiff, | ) | |
| | ) | |
|     vs. | ) | Phoenix, Arizona |
| | ) | December 18, 2020 |
| Merck & Company Incorporated, | ) | 9:57 a.m. |
| et al., | ) | |
| | ) | |
|     Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TELEPHONIC RULE 16 SCHEDULING CONFERENCE**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                      **A P P E A R A N C E S**

2

  For the Plaintiff:

3

      Andrew D. Downing, Esq.
4     Van Cott & Talamante PLLC
      3030 N. 3rd Street, Suite 790
5     Phoenix, AZ 85012

6     Bijan Esfandiari, Esq.
      Nicole Maldonado, Esq.
7     Monique Alarcon, Esq.
      Pedram Esfandiary, Esq.
8     Baum Hedlund Aristei Goldman PC
      10940 Wilshire Boulevard, 17th Floor
9     Los Angeles, CA 90024

10  For the Defendants:

11      Foster Robberson, Esq.
      Lewis Roca Rothgerber Christie LLP
12    201 E. Washington Street, Suite 1200
      Phoenix, AZ 85004

13

14    Christina Lee Gaarder, Esq.
      Dino Sangiamo, Esq.
      Brian Healy, Esq.
15    Venable LLP
      750 E. Pratt Street, Suite 900
16    Baltimore, MD 21202

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

(Proceedings commenced at 9:57 a.m.)

THE COURTROOM DEPUTY:  This is Case No. CV-2020-1425, Gramza versus Merck & Company Incorporated and others.  This is the time set for a Rule 16 scheduling conference.

Would the parties please announce for the record.

MR. DOWNING:  Good morning, Your Honor.  This is Drew Downing with the Van Cott & Talamante firm here in Phoenix for plaintiff, Jasmyne Gramza.

And then also with us on the phone this morning, I guess at our virtual counsel table, Your Honor, is Bijan Esfandiari, Nicole Maldonado, Monique Alarcon, and Pedram Esfandiary with the Baum Hedlund firm in Los Angeles.

THE COURT:  Mr. Downing, will you be doing the speaking for plaintiffs in this call?

MR. DOWNING:  Your Honor, I suspect that most of the issues to be addressed with regards to this conference today will be handled by Bijan Esfandiari.  He participated in most of the conversations with defense counsel.

THE COURT:  Okay.  Thank you.

MS. GAARDER:  Your Honor, this is Christina Gaarder on behalf of Merck.  And also with me is Dino Sangiamo and Brian Healy from Venable, and then Foster Robberson from Lewis Roca.

THE COURT:  And who will be speaking for the defense?

MS. GAARDER:  I believe I will be doing most of the

1   speaking, Your Honor, Christina Gaarder.

2          THE COURT:  Okay.  Thank you.

3          Is that everybody then?  I guess so.  Okay.

4          All right.  Good morning.  This is Judge Rayes.  This

5   is time for our scheduling conference.  I've had a chance to

6   review the joint report of the parties, and I just want to have

7   a -- I have a few questions before we get down to business.

8          First, let -- is it -- Esfandiari?  Am I pronouncing

9   that right?

10         MR. ESFANDIARI:  It's Bijan Esfandiari, Your Honor,

11  and good morning.  Esfandiari.

12         THE COURT:  Good morning.  Esfandiari?

13         MR. ESFANDIARI:  Yeah.  Perfect.

14         THE COURT:  Okay.  Tell me, you've proposed a schedule

15  for fact discovery, and you proposed that we have a cutoff date

16  of February 28th, 2022.  Tell me, what is the discovery you

17  anticipate you'll be taking with regard to the facts?

18         MR. ESFANDIARI:  Certainly, Your Honor.  I anticipate

19  initially we would need to do extensive written discovery,

20  which has already been propounded, to collect the relevant

21  internal documents in Merck's possession.  Those would be their

22  correspondence with the FDA and the Office of Regulatory

23  Agencies, their clinical trials, all internal discussions that

24  they've had regarding the safety and efficacy of Gardasil, as

25  well as their -- you know, the analysis that either they or

1    third parties on their behalf have done on these issues, as

2    well as any marketing that they have targeted directly to

3    plaintiff's providers or within the Arizona community.

4         Those types of documents are traditionally obtained in

5    such pharmaceutical litigations.  The internal documents at

6    times will be in the millions of pages, Your Honor, once, you

7    know, everything is produced.

8         Then our experts in our firm would analyze those.  We

9    would anticipate taking depositions of relevant individuals,

10   most specifically, persons most knowledgeable within Merck as

11   well as certain discrete representatives of Merck who will be

12   identified based upon the discovery.

13        That would be the fact discovery.

14        The reason that the timeline I have proposed, Your

15   Honor, is just --

16        THE COURT:  Whoa, whoa.  Let me interrupt you, and I

17   apologize.

18        MR. ESFANDIARI:  Absolutely.

19        THE COURT:  I want to give you my thoughts on this

20   first.

21        There are four other cases involving the same issue.

22   Are you involved in those cases?

23        MR. ESFANDIARI:  I am, Your Honor.  I am, and at

24   this -- in terms of the federal litigation, this one is -- this

25   case that Your Honor has is the first one, is batter up,

1   essentially.

2          The other case is a state court case, Robi, and

3   despite being on file for four years, my firm, we got involved

4   about two years ago in that litigation.  We were asked --

5   brought in.  And not much has occurred.  We've spent a lot of

6   time, Your Honor, in discovery disputes with Merck.  Really, a

7   few issues were resolved.  We did receive some internal

8   clinical trials.

9          THE COURT:  Let me interrupt you, and I apologize.

10  You're answering way more than I asked.

11         I'm just trying to get a sense of what's happening

12  here.

13         MR. ESFANDIARI:  My apologies.

14         THE COURT:  So you have four other lawsuits.  One case

15  is proceeding, but proceeding rather slowly.  Is the discovery

16  you'll need in this case regarding the facts concerning the

17  development of this vaccine, is it the same as it would be in

18  the other three -- other four cases?

19         MR. ESFANDIARI:  I would say 95 percent of the

20  discovery in this case would be applicable to all of the other

21  cases, yes, Your Honor.

22         THE COURT:  And you said one of the requests you're

23  asking for could generate up to a million pages of documents;

24  is that right?

25         MR. ESFANDIARI:  Correct, Your Honor.  Correct.

1    Millions.

2              THE COURT:  And as far -- and you've done these cases

3    before; is that true?

4              MR. ESFANDIARI:  I do exclusively pharmaceutical and

5    medical device litigation, yes, Your Honor, for the past 15

6    years.

7              THE COURT:  And my question then is, what's the kind

8    of cost to Merck to go through and find these documents you're

9    seeking with regard to the development of this vaccine and the

10   internal correspondence and the million pages you discussed?

11             MR. ESFANDIARI:  I think that's a question better

12   posed for Merck, Your Honor.  And I would say --

13             THE COURT:  I'm going to ask them that, but you've

14   done this before.  What's been your experience, or do you have

15   any idea?  Do you know?

16             MR. ESFANDIARI:  I've never had defense counsel, you

17   know -- I would not know.  I would be speculating, Your Honor.

18   And I would --

19             THE COURT:  I guess I'm trying to understand, where

20   are these documents located so Merck -- do they have to go out

21   to a warehouse and sort through boxes of files, or where do

22   they find these things?

23             MR. ESFANDIARI:  No, these are -- majority of the

24   documents, the substantial majority of documents are

25   electronically available, Your Honor, and they've already been,

1    I would imagine, segregated and --

2         THE COURT:  Whoa, stop.  Whoa, whoa, you've answered

3    my question.

4         They're electronically available.  And how would Merck

5    identify the documents you're requesting?

6         MR. ESFANDIARI:  Usually the parties will negotiate

7    search terms, Your Honor, and then Merck would apply those

8    search terms against its databases.

9         THE COURT:  Okay.  I understand how that works.

10        So what you're telling me is you would request

11   electronic communications and other electronic material and the

12   request for production could be satisfied by Merck applying

13   search terms to locate whatever documents come up under those

14   search terms.  Is that right?

15        MR. ESFANDIARI:  For some of the discovery.  Other

16   discovery is a discrete document; for example, if we're asking

17   for a specific study, they can produce that study protocol and

18   so forth, yes.

19        THE COURT:  Okay.  So once you get all those

20   documents, then they're reviewed by your experts, who will give

21   you some information about the meaning of those documents and

22   what information you need to finish up your discovery.  Then

23   you'll go to the deposition -- deponents and ask questions

24   about those specific documents; is that true?

25        MR. ESFANDIARI:  That is true, Your Honor.

1          THE COURT:  Who will you be deposing in this case for

2     facts?

3          MR. ESFANDIARI:  For fact, there -- I would imagine

4     key personnel within Merck, such as including the people who

5     designed the studies, the people who review adverse event

6     reports, the individuals who are responsible for the labeling,

7     individuals responsible for the manufacturing, and I would

8     imagine both parties would want to depose plaintiff's treaters

9     as well as I'm sure defendant will want to depose plaintiff and

10    certain of her family members.  So that --

11         THE COURT:  We'll let defendant explain who they want

12    to depose.  I'm trying to ask who you want to depose.

13         MR. ESFANDIARI:  Sure.

14         THE COURT:  So how many depositions are you

15    anticipating you'll need for facts?

16         MR. ESFANDIARI:  For facts, it really is going to

17    depend on the documents that are produced, Your Honor, but I

18    would imagine 15, most likely --

19         THE COURT:  Yeah, I'm not holding you to -- I'm just

20    trying to get a sense of what this discovery is going to

21    entail.

22         Now, this is a vaccine.  Was this the vaccine for the

23    HPV virus?

24         MR. ESFANDIARI:  Yes, Your Honor.

25         THE COURT:  Okay.  So how many people have taken --

1    are you going to -- is this going to develop into a class

2    action?

3           MR. ESFANDIARI:  Not a class action, but there's a

4    likelihood that it may develop into an MDL at some point, Your

5    Honor.

6           THE COURT:  Okay.  All right.  So I'm trying -- what

7    I'm trying to figure out is the time -- I'm trying to balance

8    the time it will take to do this fact discovery versus the time

9    it would take to do the discovery and motion for summary

10   judgment on causation.

11          You know that's Merck's position, that we shouldn't be

12   doing any of those facts from them until they do the facts from

13   you and do the causation discovery.  Is that --

14          MR. ESFANDIARI:  Right.  And I would say the documents

15   that I've outlined that we need would also equally apply to the

16   causation issue, Your Honor, in terms of the clinical trials,

17   internal discussions.

18          THE COURT:  All right.

19          MR. ESFANDIARI:  The only thing --

20          THE COURT:  Let me interrupt you.  I apologize.

21          Explain to me, are there any documents that you

22   anticipate you'll need for fact discovery for causation that

23   would -- let me back up.

24          Are there any documents that you won't need for

25   causation that you'll need for liability?

1          MR. ESFANDIARI:  The only category that comes to mind,

2     Your Honor, would be marketing type of documents.

3          THE COURT:  Okay.  So you're saying -- I don't know --

4     how much of the total discovery would the marketing documents

5     entail?

6          MR. ESFANDIARI:  Not much, Your Honor.

7          THE COURT:  So you're saying the vast majority of the

8     discovery for causation would also be applicable to the

9     discovery for the liability portion of the case?

10          MR. ESFANDIARI:  Absolutely.

11          THE COURT:  All right.  And once you have your fact

12     discovery done, then your experts will issue written opinions.

13     How many experts are you anticipating you're going to be

14     employing in this case for purposes of trial experts?

15          MR. ESFANDIARI:  For purposes of trial experts, Your

16     Honor, I would imagine somewhere between five to seven experts.

17          THE COURT:  Okay.  All right.

18          Okay.  Let me hear from the defense, then.

19     Ms. Gaarder?

20          MS. GAARDER:  Yes, Your Honor.

21          THE COURT:  Tell me -- I'm trying to decide which way

22     we go with this discovery, whether we just do the causation

23     issue first.  And you've heard the plaintiff's position is that

24     you're not going to save us any time by just breaking up

25     causation because you'll have to do the same discovery either

1    way.

2            How is that wrong?

3            MS. GAARDER:  Correct.  That is wrong.  There are a

4    number of documents that are not needed in the causation phase.

5    Causation would focus on the -- whether Gardasil can cause

6    plaintiff's injuries, which is a fairly narrow set.

7            Now, in California, California procedure allows for

8    what they call fishing expeditions, and so the discovery there

9    is I think broader than is available in -- in federal court

10   generally.  But even there, documents relating to efficacy,

11   documents related to immunogenicity, which is the documents

12   that are about whether someone seroconverts or not, some of

13   the -- there's a wide swath of documents relating to whether

14   the vaccine is efficacious and whether people are respond --

15   their blood is responding to the vaccines.

16           Again, the marketing, as he said, would not be

17   relevant, which is a fairly -- you know, a number of custodial

18   files that we wouldn't need to collect at all if we did not do

19   causation -- if we limited this to causation.

20           And then you have -- so you would have sort of the

21   science -- some of the science files custodians would need to

22   be collected, but we wouldn't have to collect from others.

23           So we've -- we can agree on search terms that would be

24   focused -- that would focus our collections, then, on

25   causation-related issues.

1          THE COURT:  So what we're talking about is whether you

2    have a broad base of search terms that include both causation

3    and liability or if we have a more narrow set of search terms

4    only on causation.  Is that the difference we're talking about,

5    essentially, for production of documents?

6          MS. GAARDER:  And the number of custodians.  We could

7    eliminate whole categories of individuals who -- from

8    production.  As well, I mean, there's only a limited amount

9    that I think emails tell you about whether the product

10   causes -- causes plaintiff's injuries.  That's really a

11   science-based inquiry that will rely on studies and data.  And

12   the realm of what tells you whether something is -- whether

13   plaintiff's injuries are caused by Gardasil is a -- is not very

14   dependent on internal Merck correspondence, for instance.

15         THE COURT:  Well, here's my concern, is that your

16   proposed schedule takes up all of 2021 just to get to a summary

17   judgment motion.  So under your proposal, you file your motion

18   for summary judgment in October.  By the time it's fully

19   briefed, we're through December.  And by the time I get a

20   decision out, we're probably in March or April.

21         And then we're starting all over again with facts for

22   the other issues that haven't been resolved in the causation

23   motion.

24         MS. GAARDER:  But, Your Honor, I do understand that.

25   I do think causation is going to be a particularly difficult

1    hurdle here.  There are some excellent, well-done studies on

2    this particular injury the plaintiff has that show a lack of

3    causation.  And what may be helpful to the Court is for us to

4    submit some briefing on the issue that explores some of that

5    science as well as why --

6          THE COURT:  Well, I'll tell you what my concern is.

7          MS. GAARDER:  Okay.

8          THE COURT:  I'm looking at the time and cost it takes

9    for you to produce what they need on the other issues.  It

10   sounds like it's a matter of search terms.  And I don't know

11   what we would lose by moving forward and doing all the issues

12   at the same time and resolving this case in a more timely

13   fashion.

14         MS. GAARDER:  Well, I do think that it's worth

15   resolving the issue of causation before some of the things

16   occur.  For instance, depositions of Merck's marketing

17   witnesses and depositions of -- and some of those -- there are

18   rather discrete additional sources that would have to be looked

19   at, and it doesn't -- to me, it doesn't make sense to go gather

20   those until you've decided that somebody can cross the

21   causation hurdle.

22         What I --

23         THE COURT:  Well, that's always an issue in every

24   case.  In any case, there's always the causation hurdle.

25   Medical malpractice, lots of issues have causation, and we

1    don't break them out and do the causation first and go ahead

2    and do the rest of the discovery a year and a half later.

3          I'm trying to understand -- I understand that there is

4    some value in breaking it out, but I'm trying to weigh that

5    against the time and the -- it seems to be extra expensive to

6    go back and redo discovery after we get past causation.

7          Your position is you won't get past causation.  I

8    don't know that.

9          MS. GAARDER:  Right.

10         THE COURT:  And I'm looking at a case that you've

11   proposed dates that will take us a year and a half just to get

12   through the first issue, by the time I get a ruling out and it

13   gets fully briefed.  I'm sure this is going to be a very

14   complicated motion, or at least complicated as far as the facts

15   and the science and understanding the experts' opinions.

16         And I'm assuming plaintiffs will have experts who

17   render opinions in support of their position, and we'll end up

18   with a question of fact anyway.

19         MS. GAARDER:  Well, I guess that's where we -- I think

20   that the science is so thin on the other side that there's --

21   that it will be difficult for them to get past that.  What I --

22         THE COURT:  So you're banking on a Daubert motion

23   knocking out their experts, I assume, is where you're going

24   with that.

25         MS. GAARDER:  Yes.  I think that's -- that's right.

1       The --

2       THE COURT:  Well, I'm not convinced that --

3       MS. GAARDER:  I guess the other part of this is that

4   it has been bifurcated in our other case, and so we've already

5   proceeded down the road of producing the documents related to

6   causation.  And that path is, at least for now, going to hold.

7   We just had a conference with --

8       THE COURT:  Well, let me ask you this:  How far down

9   the path -- what have you produced so far?

10      MS. GAARDER:  We have produced the studies related

11  to -- for Gardasil and critical study reports for Gardasil and

12  Gardasil 9.  We've produced regulatory -- portions of the

13  regulatory file that relate to causation for Gardasil and

14  Gardasil 9.

15      We've produced what's called fact data, which is

16  patient-level data from the clinical trials.  That's the data

17  that the FDA and Merck and plaintiff's counsel -- plaintiff's

18  experts can mine for individual -- for assessment across the

19  clinical studies for however they want to slice it and dice it.

20  There's thousands of pieces of information in the fact data

21  that can be aggregated and pulled out.  It can be manipulated

22  in any way that they see fit.

23      There are documents called periodic safety update

24  reports, which provide safety information about Gardasil that

25  is -- that -- so these were ones that were filed with the FDA.

1          THE COURT:  Let me ask you this:  Have you produced

2     all the documents plaintiffs are going to need for their

3     experts in determining the causation issues?

4          MS. GAARDER:  Not yet, but we're on our way.  We just

5     had --

6          THE COURT:  When did you produce these documents that

7     you've produced?

8          MS. GAARDER:  We began the productions probably a

9     year -- summer of 2019.

10         THE COURT:  Summer of 2019.

11         MS. GAARDER:  We have been producing documents --

12    pardon?

13         THE COURT:  And these are causation-related fact

14    documents; is that right?

15         MS. GAARDER:  Correct.

16         THE COURT:  Well, then why are you asking for fact

17    discovery to go all the way into July?  It sounds like you're

18    telling me that the causation documents have been produced.  Is

19    there -- have there been other requests for production

20    regarding causation documents that haven't been produced?

21         MS. GAARDER:  There have.  There are custodial files

22    that we are working to produce, and there are some documents

23    that plaintiff had requested in California, perhaps he's not

24    requesting them here because he didn't -- he didn't mention

25    them, but they are not data -- electronic documents that can be

1   searched.  They actually exist in paper copies all over the

2   world.

3        And that's one of the issues that's before the

4   California court, is to whether that's a reasonable request, as

5   well as -- as well as some other data about the clinical trials

6   that we believe is duplicative of documents they've already

7   received.

8        THE COURT:  So in that case, why don't you just turn

9   it over if you have already -- I don't understand.  If we're

10  trying to get this --

11       MS. GAARDER:  It's in paper format.

12       THE COURT:  If we're trying to get this done and

13  focused on causation and we're having discovery disputes even

14  on that, I don't know -- I'm not sure how we're saving time by

15  doing causation first if we're wrapped up in litigation over

16  what's being produced there.  Can you tell me, is there some --

17       MS. GAARDER:  I don't think that there's --

18       THE COURT:  Go ahead.

19       MS. GAARDER:  That is -- the dispute is not about --

20  the dispute in this case, to a large extent, is not about

21  whether it relates to causation.  The question is whether the

22  request is reasonable on its face, and that does not go away

23  whether you bifurcate the case or not.

24       THE COURT:  No, but I'm just trying to understand.  If

25  the facts are pretty much already laid out and you've already

1    produced those things, maybe you've got something to talk about

2    as far as saving time.  But if you haven't produced things

3    they're asking for and you -- there's a disagreement as to

4    whether or not they're required, then we're back to where we

5    were before is how does this save time if we're not

6    producing -- if we're caught up in discovery disputes over just

7    causation, why don't we just throw the whole thing in there and

8    get the discovery done at one time.  That's how I'm looking at

9    it.

10        MS. GAARDER:  Yeah, and I don't -- I don't think the

11   causation dispute -- the discovery disputes are sort of

12   irrespective of whether the case is bifurcated.  In our view, a

13   lot of what they've requested in California has nothing to do

14   with -- they don't need them for causation.  And I think that's

15   objectively fairly reasonable.

16        But we are producing documents -- additional documents

17   there.  We had originally offered eight custodial files that

18   relate to causation.  They had --

19        THE COURT:  Let me interrupt you.  I apologize for

20   interrupting you.

21        But I assume there's a dispute regarding what they

22   need for causation and what you think they need.  As far as

23   what you think they need, have you produced everything you

24   think they need for causation?

25        MS. GAARDER:  Not yet, but we are on our way to doing

1    that.  We have produced a lot of the information that they

2    need, and in our view, there remain some custodial productions

3    to be made.

4         THE COURT:  In your view as to what they need for

5    causation, there are some productions to be made.  And are

6    those on the way or is it indefinitely postponed, or what's the

7    status of them?

8         MS. GAARDER:  No, there was a special master.  That

9    special master report has come in, so we should be able to move

10   all that forward now with some speed.

11        THE COURT:  So after -- so what does that mean?  When

12   will they get them?

13        MS. GAARDER:  A little of it depends on the California

14   judge.  She's -- so part of the problem is that this judge that

15   now has the case is essentially brand-new to the case, and she

16   has asked for a science day before she makes additional

17   rulings.  And because of the situation in California with

18   COVID, they aren't able to schedule -- she isn't able to

19   schedule a hearing --

20        THE COURT:  Okay.

21        MS. GAARDER:  -- science day out until March.

22        THE COURT:  Let me interrupt you, and I apologize.

23        Why do you need a judge's ruling to produce documents?

24   I mean, I thought you said the special master had issued a

25   report and that that was what you were waiting for.

1          MS. GAARDER:  Yeah, but there are some additional --

2          THE COURT:  But --

3          MS. GAARDER:  -- issues -- pardon?

4          There are some additional issues that remain.  They

5     would remain -- they don't remain because the case is

6     bifurcated to a large extent.

7          THE COURT:  I understand that.  I understand that, if

8     you're telling me you've already produced the causation

9     documents and there's no -- this won't spend -- you won't have

10    to spend a lot of time doing causation discovery in this case

11    because it's already been produced in the other case.  I'm

12    hearing you produced a lot of stuff but you haven't produced

13    everything, and it sounds like it's going to take a while to

14    get that all worked out since we're waiting for a judge and we

15    don't know when that judge is going to be available.

16         MS. GAARDER:  We have a date, but it's in March.

17         THE COURT:  So it sounds -- I'm trying to understand

18    how -- whether it is better and more time effective to go ahead

19    and go with your causation plan, and one of my factors is where

20    are you in your production of documents in the other case.

21         It sounds like you've made substantial production, but

22    there's also significant amount of discovery out there that

23    hasn't been produced while there's this dispute going on that

24    is a rolling dispute and you've got a special master involved

25    and you've got a judge you're waiting for, and then you're

1    going to wait till after the judge rules before you produce it.

2         So --

3         MS. GAARDER:  Only -- only certain limited categories.

4    There will be additional document productions that are ongoing.

5         THE COURT:  Well, I'm not seeing a lot of time saving

6    here if this is what we're waiting for.  Because the plaintiffs

7    aren't going to be able to be in a position to address

8    causation until everything is produced that they believe is

9    related to causation.

10        And it looks like this is dragging on.  It's been

11   since 2019 this has been going on.  And I'm just -- I don't

12   want to get caught in that time warp where we're waiting for

13   documents and things slow down while we're doing causation and

14   spend a year and a half to get causation resolved before we go

15   ahead and take up the rest of the case.

16        It's one thing if you say, yeah, we sent everything on

17   causation and we're already ready to move forward on that.

18   Then you've got something to talk about.

19        I'm hearing that you're caught up in a quagmire over

20   there of disagreements over the remaining discovery, and it

21   looks like this could go on for another six months or a year.

22        MS. GAARDER:  Your Honor, I don't think it's going to

23   take that long.  I do think that the judge that now has -- the

24   case in California has languished because of the judge to whom

25   it was -- we had a judge.  The judge eventually recused

1    herself.  There was another judge assigned.  That judge had to

2    go -- was out on leave for an extended period of time.  The

3    case was sort of over then -- overseen by yet another judge who

4    wasn't going to be the person handling the case.

5         Now the judge to whom it's assigned is finally -- is

6    back.  We've had a case management conference in front of her.

7    I have every reason to believe that things are going to move

8    speedily once she sort of gets her initial grounding on the

9    case.  She struck me as a no-nonsense judge who was going to

10   move things forward.

11        In the meantime, we have documents we are going to

12   produce on causation.  There's a limited number of discovery

13   disputes that are outstanding that she will resolve,

14   presumably, when she hears this in March, and that would

15   resolve the -- that would be the end of the issues needing to

16   be resolved on causation, and the document production would

17   then be complete.

18        The plaintiff has -- wants to depose a number of

19   witnesses.  The July date was really in order to enable the

20   witnesses to be -- for that process to be completed since we

21   haven't taken the depositions yet.  We would want to take them

22   across the cases, presumably.  And it didn't strike me that,

23   you know, seven months to depose the causation-related

24   defendants after production have been produced and depose the

25   causation-related fact witnesses was all that long, given that

1    we are in somewhat challenging times right now and --

2              THE COURT:  Let me interrupt you.

3              It's not that long to go to July to do fact discovery.

4    But it is long if it's fact discovery only for causation and we

5    end up briefing a summary judgment motion in October and

6    getting a ruling out sometime in the spring of 2022 and then

7    we're starting all over again with discovery.  That's what I'm

8    looking at.

9              And it would be very helpful if you produced

10   everything that they're asking for and we could just say

11   discovery's done with causation as far as the documents, but

12   you won't -- they won't be able to even start depositions if,

13   in March -- until March if the judge at that time enters a

14   ruling according to what your plan is.  And if the judge

15   doesn't by March, then we're still hung up waiting for the

16   production of the documents they're waiting for so they can

17   start taking the depositions.

18             So --

19             MS. GAARDER:  Well, I don't think they have to wait

20   until they have -- I don't think even they think they have to

21   wait until those issues are resolved before they can begin

22   taking depositions.

23             THE COURT:  Okay.

24             MS. GAARDER:  I don't think they're that -- they want

25   them for their experts, but I don't believe that they are of

1    the opinion that they've got to stall until that -- those

2    issues are resolved on deposing witnesses.  They want those

3    custodial files, and that's what's being produced.

4         THE COURT:  So now what we're talking about is a case

5    in California that has the same theory of liability.  Right?

6         MS. GAARDER:  Same theory of liability and not --

7    while not an identical injury, there are certainly some common

8    issues with respect to the injury.

9         THE COURT:  And it's your belief that all the

10   documents that are produced in California will be applicable to

11   the case that's going to be tried here, and there won't be a

12   need for production of any additional documents here in

13   addition to what's produced in California, at least as to

14   causation.  Is that right?

15        MS. GAARDER:  That is our -- yes.  We -- this case

16   came -- we've done one custodial file.  The injury here is

17   slightly different, but our hope is that going forward, that

18   would be the case, that we would not -- that we would make one

19   custodial production that would cover the -- both cases.

20        THE COURT:  So --

21        MS. GAARDER:  Be responsive to discovery requests in

22   both cases.

23        THE COURT:  So I guess what you're asking is that we

24   wait for -- to see what happens in California before we move

25   forward with discovery here?

1        MS. GAARDER:  No.  No, I -- they've sent discovery

2  requests.  We would respond, move forward --

3        THE COURT:  But you won't respond any differently than

4  how you've responded in California is basically what I'm

5  saying.  The discovery you produced here would be the same as

6  what you produced in California.

7        MS. GAARDER:  That's what we would ask the Court to

8  allow, yes.

9        THE COURT:  So then we'll end up with discovery

10 disputes here, too, eventually.

11       MS. GAARDER:  I mean, I -- I don't know.  I guess it

12 depends on if every -- you know, what the resolution is in

13 California and whether --

14       THE COURT:  Well, if one or the other's not satisfied

15 with the California decision, there's nothing to prevent you

16 bringing it over here in this case.

17       MS. GAARDER:  Right.

18       THE COURT:  And I have no reason to believe that's not

19 what's going to happen.  I'm just trying to get a sense of what

20 we're talking about and what savings we'll have with regard to

21 time and resources by bifurcating the discovery in this case.

22       And the fact that you guys are still in disputes over

23 causation discovery in California since 2019 doesn't give me a

24 lot of -- doesn't give me much -- I'm concerned that this is

25 going to drag on and on if we bifurcate it.

1          MS. GAARDER:  I think that -- in all honesty, Your

2     Honor, that struck me as more of an issue of how that judge

3     chose to handle it than the complexity of any dispute.  All of

4     these disputes could have been resolved on motions more -- and

5     probably more quickly.  There's a practice in California --

6          THE COURT:  Well, regardless --

7          MS. GAARDER:  -- informal discovery.  That -- but I

8     was just saying that the issues are not so complex that they

9     actually take a year to resolve.  It's just that's the way this

10    has unfolded in California.

11         THE COURT:  Well, regardless of how you got there,

12    that's where we are.

13         We're still doing discovery on causation in

14    California, and that is -- and there are still disputes about

15    that discovery in California, regardless of how you got there,

16    so --

17         So I -- I think you've answered my questions.  Let me

18    go back to plaintiff's counsel.

19         MR. ESFANDIARI:  Yes, Your Honor.

20         THE COURT:  You -- are you ready with the discovery

21    you've received from the California case to start taking

22    depositions?

23         MR. ESFANDIARI:  Not at all, Your Honor.  Not at all.

24         THE COURT:  On causation?

25         MR. ESFANDIARI:  Not at all.  Not at all, Your Honor.

THE COURT:  So let me -- I'm focusing -- let me --
just on causation.  What are you -- what do you need before you
can start taking causation depositions in this case?

MR. ESFANDIARI:  Certainly.  So just, for example,
with the California case, Your Honor, the judge in the
California case had ordered the production of 39 custodial
files.  To date, Merck has not even finished the production of
the first custodial file.  And the reason the special master
had to be brought in, because it was determined that the Court
believed that Merck was concealing relevant documents under the
guise that they're not responsive to causation.

And the special master, when she reviewed a sampling
of those documents, determined that Merck was indeed concealing
a number of documents that should have been produced that
weren't produced.

So we've been two years fighting over what exactly is
causation.  And I anticipate if we have a bifurcation in this
case, Your Honor, we would have the same issue.

Secondly, every item of document that Ms. Gaarder
identified as them having produced in California, a court order
was required.  Nothing was given to us voluntarily, Your Honor.
And we're still missing a whole host of production, including
the 39 custodial files that the Court ordered.

The raw data, which the judge had indicated should be
produced, we have not received, the raw data from the study.

1   The FDA and CDC communications between Merck concerning

2   Gardasil have not been produced, even though Merck is relying

3   upon the FDA and the CDC to claim that its product is safe.

4   The internal correspondence that Merck had with respect

5   concerning its communications with FDA have not been produced.

6          So there's a whole host out there.  Two years, nothing

7   has been --

8          THE COURT:  Whoa.  Hang on a second.  Whoa, whoa,

9   whoa.  Let me ask Ms. Gaarder.

10         Ms. Gaarder, is there anything he said that you

11  disagree with?

12         MS. GAARDER:  Yes.  Practically all of it.

13         So there is -- there are 39 custodial files that were

14  ordered to be produced.  Plaintiff submitted challenges to a

15  sample set of those documents.  They had challenged 161

16  documents that they --

17         THE COURT:  Let me ask you this.  Whoa, whoa.  The

18  custodian, you said that 39 were ordered and you produced one

19  so far.  Is that true?

20         MS. GAARDER:  That is true.  Because it got held up by

21  the special master's ruling.  We now have that and can

22  implement that across the --

23         THE COURT:  Let me back up.

24         How did the special master's ruling hold that up?  I'm

25  sorry, but I'm just not aware of what's happened over there.

1          MS. GAARDER:  That's okay.

2          THE COURT:  I'm trying to understand it.

3          MS. GAARDER:  Yep.  And it's a very unusual course.

4    So what happened is the plaintiff --

5          THE COURT:  Let me just go there.  Why didn't you just

6    produce it anyway?  Why did you need a special master to tell

7    you?  That's what I'm trying to understand.

8          MS. GAARDER:  I know.  Because things happened in

9    California that created a very odd timeline.  So instead of us

10   responding to discovery like one normally does, one answers and

11   produces documents, what the California court did was to create

12   responsiveness criteria, and that took forever to negotiate.

13         But there's a list of criteria that have to be met to

14   determine whether a document is or is not responsive.  And then

15   the special master -- and so we applied that across one

16   custodial file, producing initially a sampling of that

17   custodial file and then the whole custodial file.

18         Of the sampling, plaintiff challenged a number of the

19   documents and said that they believed they fell into

20   responsiveness criteria.  Our position was that they didn't.

21   The plaintiffs -- we took that to a special master, who looked

22   at the 161 challenges and thought that 38 of those documents

23   that they had challenged were, in fact, responsive.

24         And you can -- by looking at what she did, can figure

25   out where the gaps were and can -- and can implement the

1   special master's ruling to produce the remaining 39 custodians,

2   but there was no -- you couldn't move forward with the 39

3   custodians if you didn't know what this responsiveness criteria

4   was ultimately going to be.

5          One would presume that in this case, as in every other

6   case, when we would get the documents request and simply

7   produce documents.  How that got so bolloxed up in California,

8   even though I was part of it, I still don't understand how we

9   got to the place where we are judging before documents are

10  produced whether they're responsive or not.

11         But be that as it may, we could do it differently here

12  and we can just look at the requests and do what parties

13  normally do, produce documents in response to the requests.

14         THE COURT:  Well, there was nothing preventing you

15  from doing that in California, was there?

16         MS. GAARDER:  There was, because we would have to redo

17  it if the responsiveness criteria changed.  We couldn't

18  agree -- and there was -- there was issues on the search terms

19  and the scope of responsiveness, all of which held up the --

20  collecting the documents in the first place, because we had to

21  agree on the search terms, and then they were -- the judge

22  wanted a particular -- initially wanted a particular

23  responsiveness rate, which took a while to try to get a

24  responsiveness rate that was what the Court was looking for.

25         THE COURT:  Okay.

1          MS. GAARDER:  And then this responsiveness review.

2    One -- I presume now that things can begin to move forward

3    because I think the challenges to search terms --

4          THE COURT:  Let me back up.  You just said nothing's

5    going to happen until you see the judge in March, it sounds

6    like.

7          MS. GAARDER:  No, sir.  The custodial files can move

8    forward.

9          THE COURT:  So what's happening in March, then?

10         MS. GAARDER:  March, she's going to take up the issue

11   of CDC communication -- so one of the odd -- one of the quirks

12   of what happened is that the -- while you look at the custodial

13   files and you produce causation-related FDA documents, one of

14   the -- the Court ordered that for custodial files, we produce

15   all communications with the CDC.  Our view was you should

16   just -- that's -- we should just apply the same responsiveness

17   criteria across both.

18         There's also issues with respect to what's called

19   clinical study -- sorry -- case report forms, which are

20   those -- I was telling you about the fact data, which is the

21   electronic -- essentially, the electronic version of paper

22   documents.  And the plaintiffs want the original paper

23   documents, which are literally on every continent in the world,

24   stored in various off-site storage locations.  And they want us

25   to go worldwide and collect all of those paper forms that were

1    converted to electronic data that was used by the FDA.

2            That's an unprecedented request.  Merck has never had

3    to do that in any litigation, even massive MDLs.

4            THE COURT:  Let me ask you, Ms. Gaarder, what document

5    is -- what's the name of that document that they asked for it

6    in paper?

7            MS. GAARDER:  They're asking for clinical -- or case

8    report forms.

9            THE COURT:  Okay.  All right.  Let me ask plaintiff's

10   counsel --

11           MS. GAARDER:  When a patient comes in to do a clinical

12   trial, they have a paper form that the doctor -- that the

13   clinical investigator fills out, records medical information,

14   records data about that patient --

15           THE COURT:  Let me interrupt you.  These case report

16   forms, they're stored electronically as well as on paper; is

17   that right?

18           MS. GAARDER:  Yes.  And we've given the electronic

19   version.  We haven't gone back and collected the original paper

20   versions.

21           THE COURT:  Okay.  Let me ask plaintiff's counsel, are

22   you asking for paper for the case report forms?

23           MR. ESFANDIARI:  Your Honor, they have not -- that is

24   misrepresentation.  They have not produced the case report

25   forms.  They've produced their analysis of the case report

1    forms.  They have not produced the raw data which the Court had

2    ordered them to produce.  And --

3              THE COURT:  All right.  Let me --

4              MS. GAARDER:  There's no order.

5              THE COURT:  Let me shift gears here just for a second.

6         What do plaintiffs need in the way of discovery on

7    causation in order to start taking depositions?

8              MR. ESFANDIARI:  Certainly, Your Honor.  And if I may

9    respond -- I want to respond to just the reason, Your Honor, in

10   California it is taking so long, is because by -- Merck

11   utilized the causation bifurcation to hide relevant and

12   responsive documents.  And that's why a special master --

13             THE COURT:  I'm not asking for argument right now.  I

14   just want an answer to my question.

15        What do you need to have in the way of discovery,

16   written discovery, before -- or electronic discovery before you

17   feel you're ready to start taking depositions of the Merck

18   people and the custodians?

19             MR. ESFANDIARI:  Certainly.  All of their clinical

20   studies that they've conducted, we need the raw data obtained

21   during those clinical studies.  We need their internal

22   communications concerning those studies; for example, how the

23   studies were designed, how that design could be manipulated,

24   the internal analysis of the result, and the final reports.  We

25   need --

1              THE COURT:  Let me interrupt you now.

2              What -- where is -- what's the status of the discovery

3      requests for that material?  Is it -- I'm trying to understand,

4      where is this?  Is it a special master's report or is it

5      waiting for the judge in March, or why hasn't this been

6      produced now?

7              MR. ESFANDIARI:  Merck should have produced it.  It's

8      just a delay by Merck that's delayed the process, Your Honor,

9      because --

10             THE COURT:  I'm trying to understand.  There's

11     something coming up where there's a deadline to produce these

12     documents or this electronic discovery?

13             MR. ESFANDIARI:  We had propounded our discovery in

14     February 2019.  They were --

15             THE COURT:  Hang on a second.  Answer my question.

16             Is there any deadline set by the Court or the special

17     master or anybody else where they are to produce this, or is it

18     still in dispute whether they are going to produce these

19     documents?

20             MR. ESFANDIARI:  It's still in dispute, and we have a

21     hearing set for middle of March to determine what needs to be

22     produced for discovery that was propounded in February of 2019.

23             THE COURT:  Okay.  So this hearing, if it goes in

24     March, is hopefully going to resolve this, but it sounds like

25     there's -- nothing's getting resolved over there.

1          MR. ESFANDIARI:  That's right.

2          THE COURT:  I'm frustrated by hearing how this has

3     been going forward with discovery in California.

4          MR. ESFANDIARI:  Right.

5          THE COURT:  All right.  So you're saying, is it -- do

6     you believe that if you got this discovery in March, that you

7     could complete your fact discovery on causation by July 2nd?

8          MR. ESFANDIARI:  No, Your Honor, because we're going

9     to get a ruling from the Court in March.  And then -- and I

10    don't know how long it's going to take them to produce the

11    documents.  We're probably not even going to have the documents

12    by the time July comes around, Your Honor, given the volume of

13    documents we're talking about.

14         And one other thing I think is important in Your

15    Honor's calculus, Your Honor.  So, for example, Ms. Gaarder

16    indicated that immunogenicity and efficacy are not related to

17    causation.  We believe they are.  Plaintiff's claim in this

18    case is that the Gardasil vaccine she was given was

19    ineffective.  So that --

20         THE COURT:  Well, I'm not ready to hear arguments on

21    the facts or hear any sort of dispositive issues.  I'm just

22    trying to figure out what's going to be the best way to proceed

23    with discovery in this case, whether to break out causation or

24    to go forward.

25         MR. ESFANDIARI:  And so the point I was trying to

1    make, Your Honor, even if they prevail on causation, the case

2    will remain because plaintiff has an independent lack of

3    efficacy cause of action that we don't even want to address at

4    this bifurcated stage.  That would remain.

5         So even if Merck's dreams come true and they win all

6    the Daubert, they win the summary judgment, we still have a

7    case in place because plaintiff is also claiming that the

8    Gardasil was ineffective and that basically she was given an

9    ineffective product.

10        So no time is saved.  The case will continue in

11   existence.  And for that reason alone, there's no reason to

12   bifurcate the case, Your Honor.

13        THE COURT:  All right.  Ms. Gaarder, anything else you

14   want to add?

15        MS. GAARDER:  I mean, I would then just say that --

16   that plaintiff --

17        THE COURT:  Do you want to address the last point he

18   just made?  Do you want to address that last point?  His point

19   is that even if you win on the causation, there's still an

20   issue that has to be resolved that requires discovery on the

21   liability issues.

22        MS. GAARDER:  I think all -- I mean, I think all

23   claims require an injury, and there is no injury.

24        THE COURT:  All right.  Well, I -- I don't see how the

25   bifurcation is going to save us any time.  It's going to cost a

1   lot of time and in the long run I think be more expensive for

2   the parties to try to litigate two separate cases here, first

3   the causation case, then later the liability case.

4          Litigating the causation case so far has gone on for

5   over a year in California, and there's still -- you're still

6   litigating the discovery in that case.  And I don't see any

7   resolution coming out in March that will result in the ability

8   to complete fact discovery as suggested in the defense proposal

9   in July.  I don't see how you get it in done in July if you're

10  waiting till March to produce the remaining documents --

11  waiting to hear from the judge that you have to produce the

12  documents, then produce them after that in March.  So I don't

13  think the proposed discovery schedule by the defense is

14  realistic.

15         So we're not going to bifurcate.  We're going to go

16  ahead with plaintiff's position, and I'm going set the

17  following deadlines:

18         Fact discovery completion deadline is February 28th,

19  2022.

20         Plaintiff's disclosure of expert opinions and their

21  experts will be March 4, 2022.

22         Defendants' disclosure of experts' opinions and their

23  experts will be March -- well, no.  We'll make it April 4,

24  2022.

25         Plaintiff's rebuttal experts will be -- the opinions

1    of the plaintiff's -- I assume you're not going to add new

2    experts, but you may have additional opinions from your

3    disclosed experts after you hear from the defense experts.  And

4    that will be April 15 -- excuse me, April 19.

5              The deadline for completing expert depositions will be

6    May 31.

7              Dispositive motion deadline, June 13.

8              Now, the dispositive motion deadline is also the

9    deadline for Daubert motions.

10             All right.  Good faith settlement discussions

11   deadline, June 27, '22.

12             I need to set a deadline for adding parties and

13   amending pleadings.  I'm going to set that deadline for June 1,

14   2021.

15             Now, if there are discovery disputes -- and I

16   anticipate there will be in this case, it sounds like this case

17   has had a history of that -- do not file a motion.  You will

18   contact -- and the order I'll issue with this schedule is going

19   to tell you how to do this, but you'll contact my JA, Michele.

20   Call here.  She will set up a conference call for us to discuss

21   the dispute.

22             In most cases, I can resolve almost all the disputes

23   over the phone.  This case may be exceptional, I don't know.

24   If I can't resolve it over the phone, we'll set a very short

25   briefing schedule and get it briefed and get it resolved.

1          I don't want a discovery dispute to interfere with

2    these deadlines.  Even though they're pretty far out, this case

3    is going to have, it looks like, a lot of discovery that's

4    going to need to be resolved.

5          If you feel before we get on the phone there is

6    something I should see or read, either a case or some facts,

7    each side can file a five-page memorandum as long as I get it

8    at least 24 hours before the phone call.

9          Motions for summary judgment, we do not do separate

10   statements of fact.  You work your facts into the motion and

11   attach any documents that are relevant to the motion to the

12   motion itself.

13         We -- I don't set -- some cases I set status

14   conferences.  I'm not going to do that in this case.  But I am

15   available by phone very readily if there are any things that

16   come up that counsel need to talk to me about.  Normally that's

17   a discovery dispute, but there could be other things coming up

18   regarding scheduling and we can take care of that by phone.

19         So I'm not setting a specific status -- a date for a

20   status conference, but I want counsel to know that I'm readily

21   available by phone if issues come up.  Of course, please try to

22   work any disputes out before you call me.  But if you can't get

23   it worked out, then let's get on the phone and work it out.

24         All right.  Are there any questions or anything to

25   take up while we're still on the phone?

1      MR. ESFANDIARI:  Your Honor, there is one issue.  The

2  parties are in the process of meeting and conferring on ESI

3  protocols and a protective order.  We're still having the

4  discussions and very -- narrowing the issues.  There may be one

5  or two discrete issues that the parties will not be able to

6  resolve and may require the Court's attention.

7      What is the best way to get that in front of Your

8  Honor?  And I would like to have that resolved sooner than

9  later because I know, for example, Merck doesn't want to

10  produce anything until there's a protective order in place, and

11  likewise with the plaintiff, because we're talking about

12  sensitive medical records and Merck is talking about its

13  sensitive internal documents.

14      THE COURT:  Can you give me some idea of what the

15  dispute is about?

16      MR. ESFANDIARI:  Certainly.  So, for example, with

17  respect to the protective order, Your Honor, it's -- Merck

18  wants to have two levels of designation, and for one of those

19  levels of designation, it doesn't want to permit plaintiff to

20  even show the documents to trial witnesses or deposition

21  witnesses.

22      It likewise, for anything it produces, for certain

23  experts and consultants that we retain, Merck wants us to

24  provide the names and résumés of our experts and consultants to

25  Merck and get their permission before we're allowed to retain

```
 1    those consultants to show them these internal documents,

 2    something I've never had to do in 15 years -- or 20 years now

 3    of doing litigation.

 4         Those are the two issues with respect to the

 5    protective order.  The ESI --

 6         THE COURT:  All right.  I've heard enough.  What I

 7    need you to do is sit down and talk.  That second item is

 8    probably not going to happen.

 9         The first one, if you guys can't agree on that, we

10    need to probably brief it so I can see what the issue is.  I'm

11    not sure that's one I can handle by the phone.  The second one

12    sounds like a pretty easy one.  But the first issue you raised,

13    if you can't reach an agreement, file a motion and make it no

14    more than seven pages per side.

15         MR. ESFANDIARI:  Very well.

16         THE COURT:  All right.

17         MR. ESFANDIARI:  Simultaneous filing, Your Honor, on

18    the motion?  So that both parties brief the issues or

19    plaintiff --

20         THE COURT:  No.  One side go and file the motion, then

21    the response and the reply.

22         MR. ESFANDIARI:  Okay.

23         THE COURT:  The response to the motion will be due

24    seven days after the motion is filed.  The reply is due three

25    days after the response.
```

```
 1              MR. ESFANDIARI:  Very well, Your Honor.

 2              THE COURT:  Okay.

 3              All right.  Anything else to bring up?

 4              MR. ESFANDIARI:  Nothing from the plaintiff, Your

 5    Honor.

 6              THE COURT:  Anything from the defense?

 7              MS. GAARDER:  No, Your Honor.  That does it.

 8              THE COURT:  Okay.  Then we'll stand in recess.

 9    Bye-bye.

10              (Proceedings concluded at 10:55 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E

I, JENNIFER A. PANCRATZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control to the best of my ability due to the limitations in technology.

DATED at Phoenix, Arizona, this 11th day of January, 2021.


                    s/Jennifer A. Pancratz_____
                    Jennifer A. Pancratz, RMR, CRR, FCRR, CRC