BEFORE THE UNITED STATES JUDICAL PANEL
ON MULTIDISTRICT LITIGATION

IN RE: GARDASIL PRODUCTS             MDL DOCKET NO. 3036
LIABILITY LITIGATION

**INTERESTED PARTY RESPONSE IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

Plaintiffs Maeson Derr (M.D. North Carolina), Payton Bergin (W.D. North Carolina), and Kameron Hilton (W.D. North Carolina) (collectively "Plaintiffs") submit this Interested Party Response.

## INTRODUCTION

Pursuant to 28 U.S.C. 1407 and Rule 6.2(e) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Plaintiffs support centralization of these lawsuits, which all relate to the plaintiffs' alleged injuries after receiving Gardasil, Defendant Merck's "cervical cancer vaccine." The Panel should consider centralizing these cases in the District of Arizona before the Honorable Judge Douglas L. Rayes or alternatively, in the Western District of Wisconsin before the Honorable Judge James D. Peterson.

## FACTUAL BACKGROUND

I. **Filed Cases as of May 20, 2022 and Additional Cases To Be Filed**

As of May 20, 2022, there are at least 33 Gardasil personal injury autoimmune lawsuits pending in 25 different district courts, before 31 different judges being handled by eight different plaintiffs' law firms (the "Subject Actions"). *See* D.E. 8-1 (Schedule of Actions).

In addition to these 33 Gardasil autoimmune cases pending in federal district courts, there are approximately 39 additional Gardasil autoimmune cases that have already gone through the

mandatory U.S. Court of Federal Claims ("Vaccine Court") process that will likely be filed in the coming months in federal courts across the country; and 52 additional Gardasil autoimmune cases currently pending in Vaccine Court, which upon conclusion of the Vaccine Court proceedings, will proceed with filing traditional tort claims, akin to the plaintiffs who currently have Gardasil tort cases pending in various district courts.  If all of the cases currently in Vaccine Court and those that have recently come out of Vaccine Court are filed in federal courts (which is likely), there will be 129 Gardasil autoimmune personal injury cases in federal district courts.

Moreover, various plaintiffs' counsel and other firms across the country are currently investigating many more Gardasil-related cases which will likely result in further litigation.

Although the facts pertaining to the individual plaintiffs will vary, the Subject Actions present common, complex factual issues related to the clinical trials, regulatory approval, manufacturing, pharmacovigilance, labeling and marketing of Gardasil and Merck's knowledge of the vaccine's adverse effects.  Coordination of pretrial proceedings of the Subject Actions and any additionally filed Gardasil autoimmune cases is necessary to avoid duplicative discovery, unduly burdensome discovery obligations, and inconsistent rulings on pretrial motions.  Centralization will preserve resources of the parties, counsel, and the judiciary. Accordingly, transfer will promote the just and efficient conduct of the Subject Actions and they are suitable for transfer, coordination, and centralization.

## II.    **Gardasil and Its Regulatory History**

In June 2006, after the Food and Drug Administration's ("FDA") fast-tracked review, Gardasil was approved for use in females ages 9 through 26 for the purported prevention of cervical cancer.  In December 2014, the FDA approved Gardasil 9 (containing the same ingredients as

Gardasil, but in higher quantities)[1] for use in girls ages 9 through 26 and boys ages 9 through 15 for the purported prevention of cervical, vaginal, and anal cancers. This rush to approval left unanswered questions relating to the efficacy and safety of the vaccine. Merck obscured information relating to these issues. Presently, Gardasil 9 has been approved for and is being promoted by Merck to males and females between 9 and 45 years of age, with an emphasis on pre-teens and their parents. In a best-case scenario, Gardasil causes immune hyperactivation and production of anti-HPV antibodies to fend off certain strains of the HPV virus. In a worst-case scenario, it causes the immune system to lose its ability to differentiate human proteins from foreign proteins, causing the immune system to attack the body's own proteins and organs.

To stimulate an enhanced immune response, Merck added adjuvants to the Gardasil vaccine, including (but not limited to) a proprietary aluminum known as amorphous aluminum hydroxyphosphate sulfate (AAHS) and HPV LI-DNA fragments. Because of the peptide commonality between HPV and human proteins, the attack triggered by the Gardasil adjuvants can cause cross-reactions and dangerous attacks against human proteins.[2] This process, which is referred to as "molecular mimicry," can cause autoimmune disorders.

## ARGUMENT

**I.     Centralization of the Subject Actions under 28 U.S.C. § 1407 is Appropriate**

The Panel may consider consolidating multiple cases if the moving parties sufficiently demonstrate that: (1) "civil actions involving one or more common questions of fact are pending

---

[1] After the approval of the Gardasil 9 vaccine, the original Gardasil vaccine was phased out of the U.S. Market and the original Gardasil vaccine is no longer available for sale in the United States.
[2] 82 heptapeptide sequences have been identified that overlap perfectly with the HPV16 proteins. "Based on the need for five or six amino acids to induce a monoclonal antibody response, the 82 heptapeptide overlaps can clearly induce autoimmune reactions." Darja Kanduc, *Quantifying the Possible Cross-Reactivity Risk of an HPV16 Vaccine*, 8 Journal of Experimental Therapeutics and Oncology 65 (2009).

in different districts;" (2) transfer and coordination "will promote the just and efficient conduct of such actions;" and (3) transfer and coordination will serve "the convenience of parties and witnesses." 28 U.S.C. § 1407(a). Here, all three factors support centralization and coordination of the Subject Actions.

As noted above, 33 Gardasil-related Subject Actions are currently pending in 25 different federal district courts. The diversity of jurisdictions and respective counsel for the Subject Actions make it impossible to informally coordinate this litigation. However, except for the diversity of jurisdictions and counsel, the Subject Actions share many common features which mandate centralization. More specifically, the Subject Actions stem from common factual allegations, involve common Defendants, a common mechanism of injury, and common damages. Furthermore, the current procedural posture and status of discovery also point to centralization as a favorable method for case administration to promote efficiency and convenience.

### A. Common Factual Questions

Each Subject Action alleges nearly identical facts concerning the same vaccine against the same two Defendant Merck entities. The Subject Actions contain almost identical allegations about Gardasil and its propensity to cause neurological injuries and autoimmune diseases. In turn, Defendant Merck will deny Plaintiffs' allegations. These defenses will involve common questions of fact on both liability and causation.

Specifically, the plaintiffs in the Subject Actions allege they were injured by the Gardasil vaccine, which, through the unintended processes of molecular mimicry, caused them to develop autoimmune disorders, Posture Orthostatic Tachycardia Syndrome (POTS)/Orthostatic Intolerance, and Immune Thrombocytopenic Purpura (ITP). The plaintiffs allege Merck concealed the known dangers of Gardasil and that Merck's targeted consumers and doctors did not know the

4

true risks. The plaintiffs in the Subject Actions have universally alleged that Merck breached its duty of reasonable care and failed to exercise ordinary care in the research, manufacturing, testing, marketing, pharmacovigilance, promotion, and labeling of Gardasil, causing their injuries. The factual investigation in all cases will focus on whether Gardasil has unreasonably dangerous side effects, whether Merck adequately warned of side effects, and whether Gardasil caused Plaintiffs' injuries. Centralization is appropriate given that the plaintiffs' allegations stem from the same basic facts, involve the same injuries, and a common mechanism of injury.

Moreover, Merck is the Defendant in each of the Subject Actions. Because Merck is the sole manufacturer of Gardasil, in addition to defending the 33 Subject Actions, Merck will also be the named Defendant in any of the "tag-along" matters that are expected to be filed in the future. Accordingly, centralization is appropriate.

     **B.**    **Just and Efficient Conduct**

Additionally, centralization before one MDL court will promote just and efficient conduct of the Subject Actions and any future "tag-along" lawsuits. Because these cases share a factual background, as described above, centralization will prevent inconsistent judicial rulings and eliminate duplicative discovery. *See, In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 330 F. Supp. 3d at 1379 (highlighting that consolidation will eliminate duplicative discovery, prevent inconsistent pretrial rulings on *Daubert* issues and other pretrial matters, and conserve resources); *In re MLR, LLC, Patent Litig.*, 269 F. Supp. 2d 1380, 1381 (J.P.M.L. 2003) (consolidation before a single transferee judge allows for consideration of "all parties' legitimate discovery needs while

ensuring that common parties and witnesses are not subjected to discovery demands which duplicate activity that has already occurred or is occurring in other actions.").[3]

Currently, the Subject Actions have a common procedural status—they are at the beginning stages of litigation and none have progressed very far in discovery. While Merck has produced documents in a few of the Subject Actions, it is not believed that Merck has produced documents in any of the other cases. To date, no depositions of Merck company witnesses have taken place and expert discovery has not yet begun. The only depositions that have occurred to date are the depositions of two plaintiffs and their respective mothers. Expert discovery has not commenced in any action.

The issuance of conflicting scheduling orders and orders on motions to dismiss is further justification for consolidation. To date, Scheduling Orders have been issued in some of the cases with vastly differing dates. As way of example, in one case, *Stratton*, the court has scheduled plaintiff's expert disclosures for July 1, 2022, while in *Muller*, plaintiff's expert reports are due January 30, 2023. Additionally, while Merck has filed answers in several cases (without any motion practice), in other cases it has filed motions to dismiss. The most recent motion to dismiss to be decided was in *Colbath* wherein the court denied Merck's motion as to the negligence, strict liability (failure to warn), fraud (concealment) and false advertising causes of action and granted with leave to amend as to manufacturing defect, fraud, and express warranty. *Colbath v. Merck*, No. 3:21-CV-120-W (DEB), 2022 WL 935195 (S.D. Cal. Mar. 29, 2022). In another district court in the Ninth Circuit, reviewing a nearly identical complaint as *Colbath* with the same injuries (POTS), the court dismissed all causes of action with leave to amend. *Flores v. Merck & Co.*, No.

---

[3] *See also In re: Farxiga (Dapagliflozin) Prods. Liab. Litig.*, 273 F. Supp. 3d 1380, 1380-83 (J.P.M.L. 2017) (same); *In re: Biomet M2A Magnum Hip Implant Prods. Liab. Litig.*, 896 F. Supp. 2d 1339, 1340 (J.P.M.L. 2012) (same).

321-CV-00166-MMDCLB, 2022 WL 798374 (D. Nev. Mar. 16, 2022). The issuance of conflicting orders on motions to dismiss is further justification for consolidation.[4]

Given the current early stage of the Subject Actions, the fact that no depositions of Merck employees have taken place, expert discovery has yet to initiate, and the earliest trial date is not until next year (2023), the time is ripe to centralize these cases, and reap the maximum benefits from the creation of an MDL in terms of efficiency and preservation of resources. Indeed, because the lawsuits alleging injuries due to Merck's Gardasil vaccine are based upon substantially similar, if not identical, allegations, the parties will address similar issues in discovery, and in some cases identical issues, especially those involving causation, the plaintiffs' injuries, and the misrepresentations on which Plaintiffs relied. *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 148 F. Supp. 3d 1383, 1385 (J.P.M.L. 2015) (deeming transfer appropriate where related actions shared factual issues related to allegations of injuries from a defective warming system); *see also In re Actos Prods. Liab. Litig.*, 840 F. Supp. 2d 1356 (J.P.M.L. 2011) (granting consolidation where: (1) the actions involved common questions of fact regarding whether the pharmaceutical drug could cause cancer and whether defendants concealed their knowledge of the risk and failed to provide adequate warnings, and (2) centralization would eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary). In the absence of centralization, the parties will inevitably face inconsistent rulings, duplicative and burdensome discovery obligations, and conflicting scheduling orders.

---

[4] Recognizing the potential for conflict, some courts have granted motions to stay pending a decision by the Panel. *See e.g. Malloy v. Merck. & Co., Inc.*, 6:21-cv-506 (E.D. Tex.). In *Malloy*, the court ruled that judicial economy favored a stay, noting that despite having some unique issues related to Texas law, "there are also several common and overlapping issues that can likely be handled more efficiently in a consolidated MDL." *Id.*

7

### C. Convenience

Finally, as noted above, the need for centralization is warranted because there are already 33 Gardasil lawsuits on file in 25 different federal district courts across the country. These lawsuits span nine federal circuits. Taken together, these cases will ultimately result in separate scheduling orders, as demonstrated above, and duplicative discovery and pretrial practices if an MDL is not created. The panel should therefore authorize an MDL so that pretrial proceedings "will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties." *In re: Prempro Prods. Liab. Litig.*, 254 F. Supp. 2d 1366, 1368 (J.P.M.L. 2003); *see also In re: Taxotere (Doxetaxel) Eye Injury Prods Liab. Litig.*, MDL No. 3203, 2022 WL 303562, at *1 (granting centralization for 13 lawsuits); *In re: Farxiga*, 273 F. Supp. 3d at 1381-82 (granting centralization for 18 lawsuits that involved "allegations that ingestion of the drug Farxiga may cause a variety of injuries").

## II. Informal Coordination is Impractical

Informal coordination is not a practical alternative to centralization for these cases. "[T]he number of actions, districts, and involved counsel, and the complexity of the litigation, make effective coordination on an informal basis impracticable." *In re Uber Tech., Inc.*, *Data Breach Litig.*, 304 F. Supp. 1351, 1354 (J.P.M.L. 2018) (informal coordination was not a practicable alternative to centralization where ten actions, with a potential for seven more, were pending in nine districts). It would be inefficient and uneconomical to engage in informal coordination amongst so many different cases, districts, and involved counsel, particularly when previous attempts at informal coordination of the first five filed cases proved to be futile and impractical.

*See In re: Roundup Prods Liab. Litig.*, 214 F. Supp. 1346, 1348 (J.P.M.L 2016) (concluding informal coordination of 37 actions pending in 21 districts was not practicable).

**A. Discovery will be difficult to informally coordinate within multiple districts with cases at various stages across the country.**

"The number of involved districts … pose[s] [a] significant obstacle[] to informal coordination" especially for discovery. *In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.*, 224 F. Supp. 3d 1330, 1331 (J.P.M.L 2016). As is common in an MDL proceeding, the plaintiffs anticipate taking the depositions of treating physicians, third-party witnesses, and current and former employees of Merck who worked on Gardasil, many of whom will be deposed in multiple cases or will discuss overlapping issues. It would be very difficult to informally coordinate the timing and scope of this discovery across numerous cases in different stages of litigation. "[A] single court can more effectively manage the discovery disputes … likely to arise, including those relating to discovery from third party witnesses, depositions of apex witnesses, and the scope of relevant discovery, generally." *In re Ahern Rentals, Inc., Trade Secret Litig.*, 481 F. Supp. 3d 1355, 1356 (J.P.M.L. 2020) (granting consolidation in lieu of informal coordination for ten actions pending in eight districts). Centralization of these proceedings, rather than informal coordination, would thus be more convenient for the parties and witnesses and would "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).

**B. Without a centralized process, motion practice will be duplicative, resulting in disparate judicial rulings and a tax on the judiciary.**

While Merck has filed answers in certain Subject Actions, in others, Merck has filed Rule 12(b)(6) motions which have already resulted in inconsistent rulings. With no centralized process, duplicative staggered motions will result in inconsistent rulings on nearly identical motions and underlying facts. This becomes particularly likely for *Daubert* and summary judgment motions,

9

given the complex medical, scientific, and legal concepts at issue in these actions. A single Court reviewer will achieve far greater consistency than the efforts of multiple judges and parties across the country. "Were this litigation smaller, such duplicative discovery and motion practice might be effectively coordinated on an informal basis by the parties and involved courts." *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, 190 F. Supp. 3d 1361, 1362 (J.P.M.L. 2016). But "[c]entralization of these … actions before a single judge will yield greater efficiency and cost benefits for both the parties and the courts than informal cooperation and coordination can achieve." *Id.* at 1363 (holding that "centralization [was] the best option" for that litigation involving twenty actions in separate district courts).

Additionally, duplicative motion practice encourages forum shopping and strains judicial resources. As cases are guided by different scheduling orders, motions are filed and ruled upon at different times, which means that unsuccessful matters in one jurisdiction can be re-framed and re-litigated in other jurisdictions. This incentivizes forum shopping and places a strain on the judiciary. Informal coordination cannot practically eliminate these risks within so many cases and districts. MDL "[c]entralization will eliminate duplicative discovery, prevent inconsistent pretrial rulings on *Daubert* and other issues, and conserve the resources of the parties, their counsel, and the judiciary." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 249 F. Supp. 3d 1357, 1361 (J.P.M.L. 2017).

### C. The number of cases and distinct courts warrant centralization over informal coordination.

The Panel has routinely found informal coordination to be unworkable where, as here, multiple cases are on file in several federal courts. *See In re: Onglyza (Saxagliptin) & Kombiglyze XR*, 289 F. Supp. 3d 1357, 1358 (J.P.M.L. 2018) ("Informal coordination among 84 cases across the nation does not seem feasible …"); *In re: Sorin 3T Heater-Cooler Sys. Prods. Liab. Litig. (No.*

10

*II)*, 289 F. Supp. 3d 1335, 1337 (J.P.M.L. 2018) ("There are now 40 actions pending in 21 districts …"); *In re: Eliquis (Apixaban) Prods. Liab. Litig.*, 282 F. Supp. 3d 1354, 1355 (J.P.M.L. 2017) ("There are now a total of 53 actions pending in 17 districts …")

### III. An Appropriate Venue for These Cases is the District of Arizona

As demonstrated above, centralization is appropriate for these cases. Selecting an appropriate transferee court is based on a balancing test of several factors, including "where the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges." *See* Manual For Complex Litigation (Fourth) § 20.131(2004) (citing Robert A. Cahn, *A Look at the Judicial Panel on Multidistrict Litigation*, 72 F.R.D. 211, 214-15 (1977)). Because this litigation is in the early stages, many of these factors are not applicable. However, Plaintiffs agree with other plaintiffs from the Subject Actions that an appropriate venue to transfer these cases to is the District of Arizona before Judge Douglas L. Rayes.

The *Gramza* case in front of Judge Douglas L. Rayes of the District of Arizona is the earliest filed federal court case and is one of the most advanced actions in this litigation. Merck has answered the Complaint and produced various internal documents in *Gramza* and the court has also adjudicated motions to compel filed by Merck. In addition to *Gramza*, there are two additional Gardasil autoimmune personal injury cases that were recently filed in the District of Arizona (for a total of three cases pending in that Court) and there are nearly a dozen cases currently pending within the Ninth Circuit. *In Re DePuy Orthopaedics, Inc.*, 753 F. Supp. 2d 1378, 1380 (J.P.M.L. 2010) (transferring to the N.D. of Ohio because, among other things, several potential tag-along actions were already pending there).

The District of Arizona would also be an efficient location for these cases, as that Court currently only has one MDL before it with none of them assigned to Judge Rayes. Accordingly, Judge Rayes more likely has the necessary time to devote to a new MDL. Given Judge Rayes' experience, he would undoubtedly be a legitimate candidate to ably oversee this litigation.

The District of Arizona is also geographically convenient, and easily located. The Court is located in Phoenix which is easily accessible, and this Panel has previously observed that "[t]he District of Arizona is not burdened by many MDLs and has the capacity and resources to successfully guide this litigation." *In re: Bard IVC Filters Prod. Liab. Litig.*, 122 F. Supp. 3d 1375, 1377 (J.P.M.L. 2015). The District of Arizona can serve as an appropriate forum for this MDL.[5]

## **CONCLUSION**

Plaintiffs support the Motion to Transfer these similar actions to the District of Arizona or, alternatively, the Western District of Wisconsin.

Dated:  May 19, 2022　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　*/s/ Allison Mullins*
　　　　　　　　　　　　　　　　　　　　Allison Mullins
　　　　　　　　　　　　　　　　　　　　amullins@turningpointlit.com
　　　　　　　　　　　　　　　　　　　　**Mullins Duncan Harrell & Russell PLLC**
　　　　　　　　　　　　　　　　　　　　300 N. Greene St., Ste. 2000
　　　　　　　　　　　　　　　　　　　　Greensboro, NC 27401
　　　　　　　　　　　　　　　　　　　　Telephone:  336-645-3320
　　　　　　　　　　　　　　　　　　　　Facsimile:  336-645-3330

　　　　　　　　　　　　　　　　　　　　*Counsel for Plaintiffs Maeson Derr, Payton Bergin, and Kameron Hilton*

---

[5] Alternatively, Plaintiffs support centralization in the Western District of Wisconsin before the Hon. Judge James D. Peterson.

| | |
|---|---|
| IN RE: GARDASIL PRODUCTS<br>LIABILITY LITIGATION | MDL DOCKET NO. 3036 |

## CERTIFICATE OF SERVICE

In accordance with Rule 4.1(a)-(b) of the Rules of Procedure for the United States Judicial Panel for Multidistrict Litigation, I hereby certify that on April 29, 2022, I electronically filed the foregoing document with the Clerk for the United States Judicial Panel on Multidistrict Litigation using the CM/ECF system. I also certify that the foregoing document is being served on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF, or via mail to the addresses indicated below:

**Served via First Class Mail (Counsel has not yet appeared):**

**Derr v. Merck & Co., Inc. and Merck Sharp & Dohme Corp.**
1:22-cv-00212-WLO-JEP

**Bergin v. Merck & Co., Inc. and Merck Sharp & Dohme Corp.**
3:22-cv-00117-RJC-DK

**Hilton v. Merck & Co., Inc. and Merck Sharp & Dohme Corp.**
5:22-cv-00030-KDB-DK

Defendants Merck & Co., Inc. and Merck Sharp & Dohme Corp.
Dino S. Sangiamo
Venable LLP
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202

Dated:  May 19, 2022                          Respectfully submitted,

*/s/ Allison Mullins*
Allison Mullins
amullins@turningpointlit.com
**Mullins Duncan Harrell & Russell PLLC**
300 N. Greene St., Ste. 2000
Greensboro, NC 27401
Telephone:  336-645-3320
Facsimile:  336-645-3330

*Counsel for Plaintiffs Maeson Derr, Payton Bergin, and Kameron Hilton*