# EXHIBIT CC

# ADVISORY COMMITTEE
# ON
# CIVIL RULES

**Washington, DC**
**November 1, 2018**

# AGENDA

### Meeting of the Advisory Committee on Civil Rules
### November 1, 2018
### Washington, DC

1. **Opening Business**

    A.  Report on the June 2018 Meeting of the Committee on Rules of Practice and Procedure
        - Draft Minutes of the June 12, 2018 Meeting of the Committee on Rules of Practice and Procedure ..........................................................17

    B.  Report on the September 2018 Session of the Judicial Conference of the United States
        - September 2018 Report of the Committee on Rules of Practice and Procedure to the Judicial Conference of the United States ..........43

2. **ACTION: Review and Approval of Minutes**
    - Draft Minutes of the April 10, 2018 Meeting of the Advisory Committee on Civil Rules ...............................................................................77

3. **Information Item: Legislative Update**
    - Pending Legislation that Would Directly or Effectively Amend the Federal Rules (115th Congress).....................................................................115

4./5. **Information Items: Status of proposed amendments to Rules 5, 23, 62, and 65.1, and Rule 30(b)(6)**
    - Chart Tracking Proposed Rules Amendments.............................................127

6. **Information Item: MDL Subcommittee**

    A.  Subcommittee Report.................................................................................139

    B.  Supporting Materials

        - Suggestion 18-CV-X (Lawyers for Civil Justice)..............................165

        - Suggestion 18-CV-T (American Association for Justice) .................181

        - Suggestion 18-CV-J (Lawyers for Civil Justice)...............................185

7. **Information Item: Social Security Review Subcommittee**

    A.    Subcommittee Report ................................................................................. 197

    B.    Supporting Materials

- Draft Rules ............................................................................... 203
- Notes of Conference Call (April 24, 2018) ............................... 209
- Notes of Conference Call (June 4, 2018) .................................. 213
- Notes of Conference Call (August 17, 2018) ............................ 217
- Notes of Conference Call (September 11, 2018) ...................... 225
- Notes of Conference Call (October 1, 2018) ............................. 231

8. **Information Item: Consent to Magistrate Judge**

    A.    Reporter's Memorandum ........................................................................ 241

    B.    Supporting Materials

- Suggestion 18-CV-H (Maggie Malloy) .................................... 247
- Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (AO 85 as Modified by the Southern District of Indiana) ....... 249

    C.    Reporter's Memorandum, cont. Regarding "Addressing Random Assignments" and "Late-Added Parties" ................................................ 253

9. **Information Item: Disclosure Statements**

    A.    Reporter's Memorandum ........................................................................ 259

    B.    Supporting Materials

- Suggestion 18-CV-S (Hon. Thomas S. Zilly) ........................... 265
- Suggestion 18-CV-W (National Association of Professional Background Screeners) ............................................................ 273

10. **Information Item: Final Judgment in Consolidated Cases**
- Reporter's Memorandum ......................................................... 279

**11. Other Docket Matters**

    A.    Opinions in Social Security and Immigration Cases

- Reporter's Memorandum ...................................................................................291
- Suggestion 18-CV-L (Judicial Conference Committee on Court Administration and Case Management) .............................................293

    B.    Time Limits to Decide Motions

- Reporter's Memorandum ...................................................................................299
- Suggestion 18-CV-V (Gary E. Peel) ..................................................................301

137    That overall number of transferred cases derives largely from a relatively small number of
138 mega-cases. One estimate the Subcommittee has received is that 90% of the individual cases
139 subject to MDL transfer orders are in 24 MDLs presenting personal-injury claims. It seems that
140 these 24 collections of cases are a prominent stimulus for the various proposals about rulemaking
141 for MDL litigation. For example, the Fairness in Class Action Litigation Act (H.R. 985, passed by
142 the House in March 2017) contains provisions regulating MDL proceedings in which personal
143 injury claims are asserted. It also seems that many of these cases are of a particular type − claims
144 based on use of pharmaceutical products or medical devices.
145
146    There continue to be MDL proceedings that have claims of a different sort from these mega
147 MDLs. Thus, the 4th edition of the Manual for Complex Litigation has, besides sections addressed
148 to mass torts, sections focusing on antitrust, securities, employment discrimination, intellectual
149 property, CERCLA, and Civil RICO litigation.
150
151    This diversity in types of MDL proceedings is relevant because the most productive
152 methods of handing one type of MDL litigation may not be suited to another type. That difference
153 might bear on what one could call the "scope" issue − what cases should new rules apply to?
154
155    What follows describes and reacts to the various concerns that many have described to the
156 Subcommittee in recent months. It resembles the list presented at the April meeting, but has been
157 considerably revised in terms of emphasis and specifics. The sequence of discussion below is:
158
159      I.    Winnowing unsupportable claims
160      II.   Interlocutory appellate review
161      III.  PSC formation and funding
162      IV.   Trial
163      V.    Settlement promotion/review
164      VI.   Third Party Litigation Funding
165
166                I.  Winnowing unsupportable claims
167
168    At the April meeting, a number of ideas on the list of discussion topics related to this
169 problem. Since April, the contours of the problem have become clearer, and those contours should
170 be useful in discussing the possible reactions. There seems to be fairly widespread agreement
171 among experienced counsel and judges that in many MDL centralizations – perhaps particularly
172 those involving claims about personal injuries resulting from use of pharmaceutical products or
173 medical devices – a significant number of claimants ultimately (often at the settlement stage) turn
174 out to have unsupportable claims, either because the claimant did not use the product involved, or
175 because the claimant had not suffered the adverse consequence in suit, or because the pertinent
176 statute of limitations had run before the claimant filed suit. The reported proportion of claims
177 falling into this category varies; the figure most often used is 20 to 30%, but in some litigations it
178 may be as high as 40% or 50%.

179    Whether these problems have manageable solutions remains unclear, however. Even if a
180 rule-based solution could be devised, it might create an undue risk of intruding too much on a
181 transferee judge's latitude to devise an appropriate treatment for a given MDL proceeding.
182

The source of these problems might be called the "Field of Dreams" problem, or "If you build it, they will come." The unfortunate reality that confronts experienced lawyers in MDL proceedings is that a significant number of claimants in those proceedings turn out not to have supportable claims. Were there no MDL centralization, arguably, this would not be a problem. Defendants would have an opportunity to challenge individual claims one by one. Indeed, but for the MDL centralization order, many of those claims might not have reached court at all.

The reasons offered to explain this phenomenon vary. One is the effect of "1-800" lawyers and "claims generators" who support an atmosphere of "get a name, make a claim." From the perspective of some, these lawyers are not complying with Rule 11. Instead, they are taking a flier in the expectation that there will be a settlement in the MDL transferee court in which they can get "inventory value" for their claims. It may be that this reported inflation of the number of claims results in part from the reality that most MDL cases settle before remand; were remand for individualized litigation the normal result of filing a claim, the frequency of unsupported claims might decline.

Another explanation offered is that amassing a large inventory of claims can support a lawyer's quest for appointment to a leadership position in the MDL – "I've got 3,000 cases, so I should be on the Plaintiffs' Steering Committee (PSC)."

Other reasons for submission of claims that turn out to be unsupported have also been offered. One is inability to get needed records. For example, when the question is whether a person has been implanted with a certain medical device, it is usually not difficult to determine whether the device in issue in the litigation is the same one. But in other instances, it may be difficult to make a similar determination. Determining which over-the-counter drug the client took may be a challenge. Even with prescribed medications, it may be difficult to determine whether the client was exposed to the challenged product. For example, in one litigation the problem turned out to be about a tainted batch of otherwise good medicine, but it was very difficult for plaintiff's counsel to find out which batch was the source of the medication used by a particular patient.

In some situations, it appears, the defendant may have records indicating whether given individuals got the specific medical device or got medication from a given batch that the plaintiff's attorney can obtain only with great difficulty.

Another frequently offered explanation is that the statute of limitations forces responsible lawyers to make claims before they have completed a full examination of the client's circumstances. What might be called protective filings can be a legitimate response to this sort of problem, though such filings should be followed by prompt further investigation to verify that the claimant actually used the product in question. Whether that further investigation routinely occurs is uncertain; some assert that some lawyers routinely make claims and do nothing more.

A variant of the limitations concern is that a given client has in fact used the product in question but has so far not suffered a negative outcome from use of the product. Attorneys representing the "healthy" user of the product may feel they must file promptly for fear failure to do so will defeat the client's claim later should full-fledged disease or injury emerge. In that situation, the very prominence of MDL orders might operate to trigger the statute of limitations even though no serious disease or injury has occurred with this plaintiff. Perhaps limitations

should not start running until the client actually manifests the condition, but counsel may fear the running of limitations will not be suspended.

A related reason that has been offered is that scientific or medical understanding of all the adverse and actionable consequences from use of or exposure to a certain substance or device may be revealed only over time. Thus, although the current litigation is about condition X, it is not clear that there is such a claim for condition Y or Z. Failure to make a claim now on behalf of those suffering from conditions Y and Z may, however, create a risk of being barred later if proof emerges supporting such a claim based on condition Y or Z. So the solution is to make a claim now. Perhaps the ideal solution to this problem would be a "split" cause of action, but the pertinent tort law may not offer that solution.

Confronting this range of situations, defendants complain of what they perceive to be an "MDL exception" to operation of the Civil Rules. In an individual litigation, they could challenge the plaintiff's allegations as insufficiently specific about the medication/device used, or about the resulting medical condition. Alternatively, they could rely on initial disclosure and prompt discovery to support a summary judgment motion to knock out claims that can't be supported.

But in MDL mass tort litigation, those tools may be unavailable to defendants. The transferee judge may focus at first on the common issues rather than the unique circumstances of each claimant. That orientation seems consistent with the basic goal of the statute. Detailed examination of the circumstances of each claimant might prove an enormous and potentially unmanageable distraction to the judge.

That distraction might also appear to require unnecessary work as well. For example, assume that the defendant has some sort of preemption defense that would be a "kill shot" with regard to all the claims, no matter how supportable they might be in terms of having used the drug in question and suffered the adverse consequence in issue. Would it not make sense for the court then to begin with a focus on that possibly dispositive issue rather than undertaking an individualized review of each plaintiff's circumstances?

This sort of concern underlies some resistance to any required early triage of individual cases. Insisting on early triage, no matter what, may hamstring the transferee judge, who might otherwise favor focusing early energies on issues of general causation, preemption, or other dispositive matters.

More generally, questions have been raised about how important it is to deal early, even if not first, with winnowing individual claims. Assume that it's likely 30% of the claims will prove not to be supportable. (Note that the fact a given plaintiff ultimately loses does not mean this was an "unsupportable" case, for many who have used the product involved and suffered the malady involved in the litigation may nonetheless fail to prove causation.) Is it urgent to find out which cases fall within the 30% up front?

One could say that, even if such sorting could be expeditiously done, the court and the parties would still have to deal with the remaining 70% of the claims. So in terms of efficient use of the court's and the parties' time and energy, it may be preferable to focus on viable claims from the

275 outset. One could even argue that such an effort is inconsistent with the thrust of MDL
276 centralization, which is designed to deal mainly with common issues rather than individual
277 circumstances of individual cases.

279 One reason advanced for treating early screening as urgent has to do with the adverse
280 consequences of having what appear to be large numbers of claims when the numbers should be
281 considerably smaller. For some medical products, there is a requirement of making an adverse
282 incident report for each reportedly adverse incident, and it appears that making a claim in litigation
283 often is treated as triggering a requirement to report.

285 Separately, the volume of claims may bear on what must be included in SEC filings and
286 reports to shareholders. Beyond that, it is reported that publicity about litigation can prompt
287 patients to stop taking their medications or to forgo needed treatment. It may also prompt doctors
288 to stop using the most effective treatment.

290 At least in the really large-volume MDL proceedings, however, it is not clear that
291 winnowing the 30% that are not supported is likely to avoid these sorts of adverse consequences.
292 Maybe reducing the number of claims by 30% will sometimes reduce the total below some sort of
293 reporting trigger, but it is not clear that is often true. Indeed, even if the 30% are dismissed with
294 alacrity, the deterrent impact on patients or doctors may already have occurred.

296 Against this background, a number of specific responses have been suggested:

298 <u>Heightened pleading requirements for mass tort plaintiffs</u>: There have been suggestions
299 that some sort of heightened or particularized pleading requirement (like the one in Rule 9(b) for
300 fraud cases) should be applied to mass tort plaintiffs. This might be different from plaintiff fact
301 sheets (discussed below). Such a pleading requirement for these tort plaintiffs that does not apply
302 to other tort plaintiffs (much less plaintiffs with non-tort claims) may be difficult to justify unless
303 there is a way to focus it solely on meritless or doubtful claims drawn by what one might call the
304 magnetic pull of the MDL litigation.

306 At least some supporters of a pleading upgrade seem to be focused only on the claims
307 presumed to result from the MDL centralization; thus, some submissions also emphasize the
308 activities of "claim generators" who may provide some lawyers with large inventories of claimant
309 names. Taken in this light, it seems that this effort is designed to counter the "MDL exception"
310 behavior that defendants may regard as depriving them of a meaningful opportunity to challenge
311 individual claims in MDL litigation and thereby inviting the filing of unsupported claims.

312 Focusing pleading changes only on post-centralization claims would presumably not
313 provide a basis for applying any such pleading requirements to cases already on file at the time of
314 an MDL transfer order, or perhaps any filed in a state court. Indeed, it seems that at least some
315 plaintiff's lawyers file in state court partly to avoid the MDL transfer that would occur if their case
316 were in federal court; it is hard to see these state-court claimants as "free riders" in the MDL
317 proceedings. Applying different standards to different individual cases before the MDL transferee
318 court could complicate that judge's task. Moreover, prescribing pleading standards applicable only
319 to tag-along cases originally filed in federal court could conceivably complicate the task of the
320 transferor court after remand, when that occurs. To the extent the "MDL exception" attitude

321 prevails among transferee judges, it may be that pleadings challenges by defendants would occur
322 after remand.

324 <u>Plaintiff Fact Sheets (PFS)</u>: In many medical products litigations the court directs the
325 plaintiffs to fill out PFSs designed to determine whether each of them has actually used the product
326 involved and/or manifested the condition on which the litigation is focused. Some of these
327 documents are quite elaborate, requiring time-consuming efforts to complete. Presumably
328 defendants must then spend time and effort analyzing the PFSs once they are completed.

330 These burdens on the parties may not impose significant burdens on the court. We have
331 heard that some MDL transferee courts have adopted administrative processes to screen out
332 claimants who don't complete and return the PFSs, with such claimants' claims subject to
333 dismissal involving only a modicum of work for the court.

335 Carefully scrutinizing the fact sheets that are completed could create burdens of quite
336 another dimension for both the court and the parties, however. It might lead to something like
337 individualized 12(b)(6) motions or "mini" summary-judgment motions. That could lead to further
338 exchanges regarding "supplemental" PFSs from those whose fact sheets are initially challenged. In
339 a way, such motions could replicate what would happen in individual litigation, but as part of the
340 MDL proceeding. Whether this individualized decision-making would be worthwhile in the MDL
341 context could be debated.

343 Another complication from the rulemaking perspective is that there likely is no "generic"
344 fact sheet suitable for all litigations, or even all pharmaceutical or medical product litigations.
345 Instead, it appears that case-specific fact sheets are the usual method of proceeding. So a rule likely
346 could not provide many specifics on what a fact sheet should address in a given case.

348 <u>Defendant fact sheets</u>: It appears that, in at least some litigations, defendants are also called
349 upon early to provide some specified information. If the PFS rulemaking idea is seriously pursued,
350 it might be even-handed also to consider a rule provision concerning information defendants
351 should provide. But as with PFSs, it seems that the specifics of any such early requirements for
352 providing information depend a great deal on the nature of a given litigation.

354 <u>Expanded initial disclosure</u>: Something along the lines of a PFS approach might be built
355 into Rule 26(a)(1). That rule already calls for every party to disclose information about witnesses
356 and documents it may use to support its claim or defense. A clarification could possibly make
357 more specific disclosures mandatory in certain cases. It might also introduce uniformity on a
358 practice now evidently subject to divergent practices of individual transferee judges. One
359 suggestion calls for adding a requirement to the initial disclosure rule that in MDL personal injury
360 proceedings plaintiffs specify the drug or medical implement they used (including its maker) and
361 also specify the harm they claim to have suffered, along with documentary or electronic evidence
362 supporting these assertions.

364 But at present the consequence prescribed in Rule 37(c)(1) is different from what the
365 proponents of this amendment seem to desire – something like immediate dismissal for those
366 plaintiffs who fail to provide the required information. So perhaps another provision could be

added to Rule 12(b) or 12(c) or perhaps Rule 56 to authorize an early motion based on what the plaintiff disclosed (or failed to disclose).

Alternatively, it might be possible to build a mechanism directly into a Rule 26(a)(1) amendment leading to dismissal. That may be somewhat out of step with the general cast of Rules 26-37; ordinarily a merits sanction or other adverse court action in regard to discovery can only occur after the court has ordered compliance and the party has failed to obey the order. Motion practice is the norm. It may be that Rules 36 or 37(d) could provide a model for such a provision, however.

Yet another possibility would resemble H.R. 985 – to impose on the court an obligation to review and determine the adequacy of each such disclosure. Such a burden might ask too much of the court, and might also be out of step with the usual "adversary system" requirement that the parties seek relief from the court rather than requiring that the court undertake the review on its own motion.

Expanding the role of Rule 11: The proponents of early screening emphasize that the unfounded claims they want winnowed out result from failures by some plaintiff's counsel to satisfy their Rule 11 obligations. Arguably, one could therefore focus on Rule 11 as a place to install a screening mechanism. There certainly have been dramatic examples of using Rule 11 to respond to unfounded claims. *See, e.g.*, *In re Engle Cases*, 288 F.Supp.3d 1174 (M.D. Fla. 2017) (sanctions of over $9 million imposed on lawyers who were found to have filed 1250 unsupportable claims, some of them on behalf of plaintiffs who did not even know the cases had been filed).

Such a provision might focus on lawyers who have filed more than a certain number of claims and impose on them a duty to show that they have complied with Rule 11(b)(3). That idea might be somewhat at odds with Rule 11(c)(2), which provides a safe harbor by requiring that a motion for sanctions be served 21 days before it is filed. (Note that the Lawsuit Abuse Reduction Act, also passed by the House of Representatives in March 2017, contains provisions that would change Rule 11 in all cases.) On the other hand, something along this line might be regarded as consistent with Rule 11(c)(3), which already authorizes the court to enter an order to show cause why "specifically described" conduct has not violated Rule 11(b). It does not seem that a court would usually be justified in concluding that all claims by plaintiffs in MDL mass tort litigation support such treatment under Rule 11(c)(3).

Rule 11 litigation has not been viewed as a positive feature of most litigation. Adopting this approach would seem inconsistent with at least some comments at conferences during this year. More than once, it has been stressed that an effective screening program should provide the affected lawyers with an "exit strategy" that is not harmful or costly to them. Shifting to a sanctions mode does not seem to move in that direction. And, as the $9 million sanction mentioned above shows, the present rule provides a basis for responding to flagrant failures to perform the investigation required by Rule 11(b)(3).

Relying on the Plaintiffs' Leadership Committee (PLC): Another theme that has emerged is that leadership on the plaintiff side might be able to facilitate this winnowing. It is clear that the

plaintiff-side lawyers the Subcommittee has talked with recognize that other lawyers file cases without adequate investigation and, sometimes, in hope of a free ride to a profitable settlement. At least on occasion, leadership counsel on the plaintiff side may be able to prompt other lawyers to remove those cases from the mix. One way that was mentioned was that leadership could say it was not intending to prepare expert causation support for claims of plaintiffs with certain experiences or certain conditions. In the California state courts, more generally, it has been said that the courts expect the PLC members to perform this service.

Selection and appointment of the PLC is addressed below (Part III). Adding such a responsibility to the others more often imposed on lead or liaison counsel could be considered. Perhaps success in handling this responsibility could be a factor in determining fee awards from common benefit funds. Perhaps it could be a factor in determining whether to reappoint originally designated leadership in MDLs in which the members of the PLC are term-limited and subject to reappointment.

Master complaints/answers: One aspect of the "MDL exception" objection is the use of master complaints. The Manual for Complex Litigation contains an exemplar case management order with such provisions. *See* Manual (4th) § 40.52 ¶ 6 at 774-75. Such documents are highly likely to be written at a level of such generality that there is no way for defendants to challenge the claims of individual plaintiffs. Some defendants urge that this generality permits claimants with unsupportable claims to evade individualized attention. It appears that, at least in some instances, MDL courts using master complaints may initially require nothing more of claimants than the pleading equivalent of "count me in," deferring individualized details until later. One could argue that such pleadings do not comply with Rule 8(a)(2), which requires a "showing that the pleader is entitled to relief." The exemplar case management order in Manual (4th) instead says (at 777): "No motion shall be filed under Rule 11, 12, or 56 without leave of court."

Nonetheless, proposals to permit master complaints and answers have been made by many, including those advocating defendants' interests. The rules presently contain no reference to "master complaints" or "master answers." One suggestion has been to add references to these documents to Rule 7(a). If Rule 7(a) were so amended, a provision in Rule 8 or Rule 12 might invite motions to require submission of individual complaints. But such a provision might seem at tension with the idea of a master complaint and answer, which might themselves be designed to deflect a preoccupation with the specifics of individual cases and variations in individual allegations. Perhaps a Rule 7(a) amendment could specify – perhaps in the Committee Note – that any plaintiff joining a "master complaint" must also provide individualized specifics of the sort sometimes required in a PFS. But that could make "master complaints" ungainly or tend to defeat a possible purpose for them – to avoid immersing the court in those individual details and flooding the clerk's office with filings. Without such a requirement, it might be said that amending Rule 7(a) puts the rules' imprimatur on exactly the sort of generalized pleading practices the proposal seems designed to change.

Filing fees: Another idea that has been proposed is to require each plaintiff to pay a full filing fee to deter unsupported claims. Rule 20 fairly flexibly permits "batching" of claims, and the federal filing fee statute presently requires that the fee be paid for each action, not for each plaintiff. *See* 28 U.S.C. § 1914(a). Reportedly, when agreements permit "direct filing" of cases in

the MDL transferee court (avoiding the step of filing in the transferor court and becoming a tag-along action), separate filings and fees are sometimes required. Perhaps a rule could somehow make a similar pay-per-plaintiff approach mandatory in tag-along cases involving Rule 20 joinder of multiple plaintiffs after MDL centralization has occurred, though that might require a statutory change. Further investigation of whether MDL transferee judges are now requiring full payment of filing fees needs to occur.

Whether this approach would produce helpful results is uncertain. So also is the proper way to handle it in removed actions. The current statute says that the court must "require the parties instituting any civil action, whether by original process, *removal* or otherwise, to pay a filing fee of $350." 28 U.S.C. § 1914(a). So it appears that the removing defendant must pay the fee. If all a plaintiff lawyer has to do to avoid the federal filing fee is to file in state court (perhaps batching dozens of plaintiffs into one suit, as allowed under state court rules), the state-court filing fee might seem modest if divided among 50 or 60 plaintiffs, and the change would seem not to achieve much. It might even mean that the removing defendant would have to pay a per-plaintiff fee to remove. But perhaps filing in state court would create risks for plaintiff's lawyers who *want* to be tag-alongs in federal court, because defendants might not remove and instead leave them to litigate their cases in state court.

<u>Adding screening as a mandatory topic in MDL cases to the 26(f) conference and 16(b) order</u>: A more flexible and promising approach might be to add discussion of a claim-screening method like the PFS as something required in certain litigation under Rule 26(f) and also adding it to Rule 16(b) as a matter for judicial attention in such cases.

This method could adapt to the specifics of individual cases. It would not be a requirement that any judge use such screening, but could provide the transferee judge with sufficient information to enable the judge to decide how best to address the concern with unfounded claims. Due to its flexibility it might avoid many potential drawbacks of the other ideas discussed above while introducing early consideration of these issues into the centralized proceeding.

On the other hand, it is likely that many cases enter the MDL proceeding only long after the time for the Rule 26(f) conference and Rule 16 order have occurred. Perhaps there is a way to adapt the existing 26(f)/16(b) sequence to the MDL setting. Nothing in Rule 16(b) or (c) would stand in the way of such orders, and Rule 16(c)(2)(L) seems to authorize such provisions. Perhaps the screening idea could be added to that part of Rule 16(c).

II. Immediate appellate review

Although the ordinary starting point is that interlocutory review is not allowed in individual cases, many urge that MDL proceedings should be treated differently because they involve so many claims and parties, and last much longer than individual tort cases. Putting those factors together suggests that some interlocutory rulings in MDL proceedings may be much more significant than similar rulings in stand-alone litigation.

Nonetheless, a preliminary question is whether MDL proceedings are really so distinctive that a special rule for interlocutory review would be appropriate. The model advanced is Rule 23(f), added in 1998 to permit immediate review of class certification orders. The Committee