# EXHIBIT 2

# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: May 17, 2022

```
* * * * * * * * * * * * *   *
KEN AND SHAUN WINGERTER,     *        No. 20-1408V
on behalf of their minor child, H.W.,  *
                             *
        Petitioners,         *        Special Master Sanders
                             *
v.                           *        Attorneys' Fees and Costs;
                             *        Good Faith; Reasonable Basis;
SECRETARY OF HEALTH          *        Withdrawal of Petition
AND HUMAN SERVICES,          *
                             *
        Respondent.          *
* * * * * * * * * * * * *   *
```

*Andrew D. Downing,* Van Cott & Talamante, PLLC, Phoenix, AZ, for Petitioner.
*Debra A. Filteau Begley*, U.S. Department of Justice, Washington, DC, for Respondent.

## ATTORNEYS' FEES AND COSTS DECISION[1]

On October 16, 2020, Ken and Shaun Wingerter ("Petitioners") filed a petition for compensation on behalf of their minor child, H.W., pursuant to the National Vaccine Injury Compensation Program ("Program" or "Vaccine Program").[2] Pet. at 1, ECF No. 1. Petitioners alleged that the human papillomavirus ("HPV" or "Gardasil") vaccine H.W. received on August 20, 2018, caused her to suffer an adverse reaction. *Id.* On July 6, 2021, Petitioners filed a notice of intent to withdraw their petition. Pet'r's Notice, ECF No. 16. I issued an order concluding proceedings on July 8, 2021. Order, ECF No. 17. Petitioners then filed a motion for attorneys' fees and costs on July 12, 2021. Pet'r's Mot. for Attorneys' Fees and Costs, ECF No. 19 [hereinafter Pet'r's Mot. for AFC]. Respondent filed a response to Petitioners' motion on July 29, 2021, and objected to an award of fees and costs because he contends that the claim lacked good faith and a reasonable basis. Resp't's Resp., ECF No. 22. Petitioners filed a reply on August 4, 2021, and a supplemental motion for attorneys' fees and costs on September 2, 2021. ECF Nos. 23–24.

---

[1] This Decision shall be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet**. In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B). Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted Decision. If, upon review, I agree that the identified material fits within the requirements of that provision, such material will be deleted from public access.
[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 et seq. (hereinafter "Vaccine Act," "the Act," or "the Program").

For the reasons stated below, I find that Petitioners have satisfied the statutory requirements for an award of attorneys' fees and costs. Therefore, I **GRANT** Petitioners' motion and find a reasonable award for final attorneys' fees and costs in the amount of **$13,181.43.**

### I.      Procedural History

Petitioners filed their petition for compensation on behalf of H.W. on October 16, 2020. Pet. Over the next few months, Petitioners filed medical records and a statement of completion. Pet'r's Exs. 1–11, ECF Nos. 6, 8, 10.

This case was reassigned to me on December 29, 2020. ECF Nos. 11–12. The next day, I ordered Respondent to file an initial status report by June 28, 2021. ECF No. 13. On June 14, 2021, I issued a 240-day notice pursuant to 42 U.S.C. § 300aa-12(g). ECF No. 15. In response, on July 6, 2021, Petitioners filed a notice of intent to withdraw their petition pursuant to 42 U.S.C. § 300aa-21(b) and requested that I issue an order concluding proceedings. ECF No. 16. Petitioners indicated that they were "statutorily compelled to initiate this claim prior to pursuing a cause of action against Merck directly." *Id.* at 1 (citing 42 U.S.C. § 300aa-11(a)(2)). On July 8, 2021, I issued an order concluding proceedings. ECF No. 17.

Petitioners filed medical literature in support of their claim on July 9, 2021. Pet'r's Exs. 12–16, ECF No. 18.[3] On July 12, 2021, Petitioners filed their first motion for attorneys' fees and costs, seeking $12,330.00 in attorneys' fees and $745.51 in costs for a total of $13,075.51, for their attorney, Andrew Downing. Pet'r's Mot. for AFC at 6. Respondent filed his response on July 29, 2021, arguing that "the records filed by [P]etitioners do not establish that their claim is supported by good faith or a reasonable basis, and [P]etitioners' motion for attorneys' fees and costs must be denied." Resp't's Resp. at 1.

On August 4, 2021, Petitioners filed a reply to Respondent's response, stating that Respondent's arguments "lack[] any foundation or support." Pet'r's Reply at 2. Petitioners contend that they are "entitled to legal [c]ounsel to guide them through the process[]" of bringing a claim. *Id.* at 4. They argue that "Respondent's over-reaching position that a [p]etitioner gets punished for exercising her statutory rights and exiting the Program must fail." *Id.* Additionally, Petitioners provided a recent Program decision on attorneys' fees deciding this issue, along with a complaint filed in the U.S. District Court for the Western District of Wisconsin regarding a claim brought against Merck directly. Pet'r's Reply, Exs. A–B, ECF No. 23. On September 2, 2021, Petitioners filed a supplemental motion for final attorneys' fees and costs, providing an invoice for an

---

[3] M. Martinez-Lavin, *Hypothesis: Human Papillomavirus Vaccination Syndrome – Small Fiber Neuropathy and Dysautonomia Could Be Its Underlying Pathogenesis,* 34:7 CLIN. RHEUMATOL. 1165–69 (2015); L. Brinth, et al., *Orthostatic Intolerance and Postural Tachycardia Syndrome as Suspected Adverse Effects of Vaccination Against Human Papillomavirus,* 21:33 VACCINE 2602–05 (2015); T. Kinoshita, et al., *Peripheral Sympathetic Nerve Dysfunction in Adolescent Japanese Girls Following Immunization with the Human Papillomavirus Vaccine,* 53:2 INTERN. MED. 185–200 (2014); S. Blitshteyn, *Postural Tachycardia Syndrome Following Human Papillomavirus Vaccination,* 21 EURO. J. NEUROL. 135–39 (2014); K. Ozawa, et al., *Suspected Adverse Effects After Human Papillomavirus Vaccination: A Temporal Relationship Between Vaccine Administration and the Appearance of Symptoms in Japan,* 40:12 DRUG SAF. 1219–29 (2017).

2

additional $2,300.50 in attorneys' fees, therefore seeking **$14,630.50** in fees and **$745.51** in costs for an amended total of **$15,376.01**. Pet'r's Supp. Mot. for AFC at 1–2. This matter is now ripe for adjudication.[4]

## II.   Medical History

H.W. was born on May 20, 2005. Pet. at 1. H.W.'s prior medical history is relevant for complaints of fatigue, intermittent sore throat, abdominal pain, and arm/leg pain. Pet'r's Ex. 4 at 44, ECF No. 6-4. H.W. presented to her pediatrician for a sore throat and ear pain on August 17, 2016, and was diagnosed with pharyngitis.[5] *Id.* at 53. She returned to her pediatrician's office on August 23, 2016, with complaints of an intermittent sore throat. *Id.* at 54. Approximately one week later, on August 31, 2016, H.W. presented for a two-week history of a sore throat and a stomachache, and she was assessed with pharyngitis. *Id.* at 57, 59. On October 20, 2016, H.W. returned to her pediatrician's office for a complaint of ear pain. *Id.* at 61. H.W. presented to her pediatrician for a three-day history of a sore throat, headache, and lack of appetite on December 2, 2016. *Id.* at 69. She was assessed with pharyngitis of unspecified etiology and a viral syndrome. *Id.* at 71.

On August 7, 2017, H.W. presented to her pediatrician complaining of the sudden onset of back pain. *Id.* at 81. She was assessed with muscular pain. *Id.* at 82. Four days later, on August 11, 2017, she returned with complaints of back spasms, intermittent leg pain, and chest pain. *Id.* at 84. Her pediatrician assessed H.W. with scoliosis and hypothyroidism.[6] *Id.* at 86. On December 14, 2017, H.W. presented with complaints of a sore throat, stomachache, and a lack of energy. *Id.* at 90. On February 14, 2018, H.W. returned to her pediatrician with complaints of back pain. *Id.* at 100.

On May 1, 2018, H.W. presented to her pediatrician reporting that she had fainted. *Id.* at 107. H.W. reported that she woke up with blurred vision and dizziness. *Id.* Her pediatrician noted that "[t]here were [two] episodes closely related in time." *Id.* Her pediatrician noted that H.W. "started her first period yesterday evening." *Id.* H.W. underwent orthostatic blood pressure and heart rate readings, which showed that when she went from laying to standing, her blood pressure did not increase, but her heart rate rose by thirty-eight beats per minute. *Id.* at 108.

H.W. was evaluated by cardiologist Robert Campbell, M.D., on May 2, 2018. *Id.* at 112. Dr. Campbell noted that H.W.'s fainting episodes were likely a cardiogenic syncope,[7] which is a "common complaint during childhood." *Id.* He did not recommend any further testing or cardiac care and instructed H.W. to increase her sodium and fluid intake. *Id.* at 112–13. H.W. returned to her pediatrician on May 4, 2018, and reported that she was feeling much better, but had persistent fatigue. *Id.* at 119. Approximately two weeks later, on May 17, 2018, H.W. presented for a sore

---

[4] This Decision encompasses Petitioners' first and supplemental motion for final attorneys' fees and costs.
[5] Pharyngitis is "inflammation of the pharynx." *Dorland's Illustrated Medical Dictionary* 1, 1426 (32nd ed. 2012) [hereinafter "*Dorland's*"].
[6] Hypothyroidism is the "deficiency of thyroid activity, characterized by decrease in basal metabolic rate, fatigue, and lethargy; if untreated, it progresses to myxedema." *Dorland's* at 907.
[7] Syncope is "a temporary suspension of consciousness due to generalized cerebral ischemia; called also *faint.*" *Dorland's* at 1818 (emphasis in original).

throat and upper respiratory complaints. *Id.* at 121. She was assessed with acute pharyngitis and nasopharyngitis.[8] *Id.* at 122–23. H.W.'s strep test was negative. *Id.* at 124. During a follow-up on July 5, 2018, H.W.'s endocrinologist noted that her hypothyroidism was stable. *Id.* at 125.

During her thirteen-year well-child visit on August 20, 2018, H.W. received the Gardasil vaccination. *Id.* at 131. Her pediatrician noted that H.W. had concerns of fatigue and difficulties concentrating. *Id.* at 136. H.W.'s physical examination was normal. *Id.* at 132.

Four days later, on August 24, 2018, H.W. presented to her pediatrician's office reporting abdominal pain beginning the same night as her HPV vaccination, which worsened the next morning when she experienced diarrhea. *Id.* at 137. She also reported that she had a sore throat which was "on and off for a week[,]" ear pain, and that her arm was still sore. *Id.* The nurse practitioner noted that H.W.'s mother had called the office for the past week reporting that H.W. had abdominal pain, a sore throat, and ear pain. *Id.* H.W.'s provider therefore indicated that H.W.'s abdominal pain had been present for five days. *Id.* H.W. did not have a fever or upper respiratory symptoms. *Id.* H.W. was assessed with abdominal pain, acute gastroenteritis,[9] acute pharyngitis, bilateral otalgia,[10] and a viral illness. *Id.* at 139. She was started on double probiotics and ordered to eat a bland diet. *Id.* On August 29, 2018, H.W. returned to her pediatrician's office reporting no change in her symptoms. *Id.* at 143. H.W. underwent testing for bacterial and viral infections, which yielded negative results. *Id.* at 145. Her stool culture was also normal. *Id.* at 147–50. She was assessed with fatigue of "unspecified type" and abdominal pain. *Id.* at 145. H.W.'s provider opined that the cause of her symptoms "seems to be a mono-like illness[.]" *Id.*

H.W. returned to her pediatrician on September 6, 2018, reporting a two-week history of a sore throat, nausea, fatigue, abdominal pain, and pain in her legs and feet. *Id.* at 152–53. Petitioners stated their concern that H.W. was having a reaction to her HPV vaccine. *Id.* at 152. In response, H.W.'s pediatrician noted "interesting[ly] enough[, H.W.] had some abdominal pain before she got her HPV [vaccine]." *Id.* H.W.'s physical examination was normal, absent flushed cheeks. *Id.* at 153–54. H.W.'s provider noted that her labs failed to show any abnormalities. *Id.* at 154. She also indicated that H.W.'s labs revealed "no signs of inflammation, so [she] doubt[ed H.W.'s] symptoms [were] related to her HPV vaccine." *Id.* She was assessed with fatigue, abdominal pain, and her pediatrician noted that Fifth Disease[11] had been ruled out. *Id.* Due to H.W.'s absence from school and prolonged immobility, her provider stressed the importance for H.W. to "recondition her body," with light walking and homework. *Id.*

---

[8] Nasopharyngitis is "inflammation of the nasopharynx[,]" which is "the part of the pharynx that lies above the level of the soft palate." *Dorland's* at 1233.

[9] Gastroenteritis is "inflammation of the lining of the stomach and intestines, characterized by anorexia, nausea, diarrhea, abdominal pain, and weakness. Causes include food poisoning . . . ; viral infections . . . ; consumption of irritating food or drink; and sometimes psychological factors such as anger, stress, or fear." *Dorland's* at 764.

[10] Otalgia is "pain in the ear." *Dorland's* at 1350.

[11] Fifth Disease is also called erythema infectiosum. It is defined as "a moderately contagious, often benign epidemic disease seen mainly in children and caused by B19 virus; the primary characteristic is a rash of abrupt onset that begins as redness of the cheeks, which appear to have been slapped; later there is a maculopapular rash on the trunk and limbs; when this fades, there may be central clearing that leaves a lacelike pattern. Immunocompromised patients may develop severe cases." *Dorland's* at 643.

Four days later, on September 10, 2018, Petitioners had a phone call conversation with H.W.'s pediatrician. *Id.* at 158. They reported that H.W. was not improving and that her mother was attempting "to get her to go for a walk and also to do some of her homework, but after a little while [H.W.] states she is exhausted." *Id.* H.W.'s pediatrician explained to Petitioners that "once a year, usually in late August, [H.W.] has [a] sore throat, or abdominal pain, that lasts for several weeks, [and she] very seldom[,] if ever[,] gets any of this during summer vacations." *Id.* Petitioners stated they wondered if this was caused by H.W. having a weak immune system, cancer, and/or other illnesses. *Id.* H.W.'s pediatrician reassured Petitioners that H.W. exhibited "normal growth, no physical findings, and negative lab work." *Id.* She opined that H.W.'s "issues have to do with stress over her [acclimating] to a hard and competitive school where they [go] too fast and she gets overwhelmed." *Id.* H.W.'s pediatrician noted that Petitioners' mention that her symptoms could be related to her HPV vaccine "w[ould] give [H.W.] a[n] opportunity to 'latch on' . . . and have even more chronic symptoms." *Id.* H.W.'s pediatrician stressed that Petitioners "need[ed] to see the big picture, and . . . that she always gets similar symptoms throughout the years, this year she just happened to get her HPV [vaccine]." *Id.* Her pediatrician recommended that H.W. move to a smaller school that moves at a slower pace, along with treatment with a psychologist. *Id.*

On October 10, 2018, H.W. presented to pediatric infectious disease specialist Steven Shore, M.D. *Id.* at 169. Petitioners expressed their concern that H.W. suffered from adverse effects of the HPV vaccine she received on August 20, 2018. *Id.* In addition to the history described above, he noted that H.W. was also experiencing difficulties sleeping. *Id.* Dr. Shore noted that he spoke with H.W.'s pediatrician, who indicated that H.W. was suffering from a "functional disorder" due to stress associated with enrollment in a competitive school. *Id.* He further noted that while H.W. continued to be treated for her pre-existing hypothyroidism, her extensive testing for other conditions was all negative. *Id.* at 169–70. He noted his impression as "[s]ymptom complex of chronic fatigue, stomach pain, nausea, weight loss, scattered areas of pain with multiple negative laboratory tests . . . [a] functional, including psychologically influenced disorder, such as anxiety and depression is suggested." *Id.* at 171. He "doubt[ed there was a] relationship to the HPV vaccine with abdominal pain beginning a week before the vaccine was given." *Id.* Dr. Shore reassured Petitioners that "the HPV vaccine probably has little to do with [H.W.'s] symptoms." *Id.*

H.W. presented to gastroenterologist Dana Dykes, M.D., on October 18, 2018. *Id.* at 167. Dr. Dykes assessment of H.W. included "functional abdominal pain and functional nausea." *Id.* She indicated that it was difficult to explain H.W.'s level of fatigue. *Id.* She opined that H.W. could have gastritis[12] given her sore throat, but this would not explain her fatigue. *Id.* She felt that H.W. may have chronic fatigue or postural orthostatic tachycardia syndrome ("POTS"),[13] "[]though not typically with orthostatic symptoms – and due to immobility this could be secondary[]." *Id.* Dr. Dykes noted that H.W. does have another autoimmune disease (hypothyroidism), "but at this point [she exhibited] no other obvious suggestion[s] for a [gastrointestinal] autoimmune cause[.]" *Id.*

On November 13, 2018, H.W. presented to pediatric rheumatologist Elaine Ramsey, M.D.

---

[12] Gastritis is "inflammation of the stomach." *Dorland's* at 762.

[13] Postural orthostatic tachycardia syndrome ("POTS") is "a group of symptoms (not including hypotension) that sometimes occur when a person assumes an upright position, including tachycardia, tremulousness, lightheadedness, sweating, and hyperventilation; this is seen more often in women than in men, and the etiology is uncertain." *Dorland's* at 1844.

Pet'r's Ex. 6 at 75, ECF No. 6-6. Petitioners reported that H.W.'s symptoms of chronic fatigue, abdominal pain, and sore throat began after her receipt of the HPV vaccine, and they were concerned that she was experiencing a vaccine-related reaction. *Id.* at 76. Petitioners further reported that H.W. also suffered from intermittent foot and leg pain, rated at an 8/10, two times a week. *Id.* H.W. reported that "her left arm and left palm started to hurt last night. It was similar to her leg pain." *Id.* Petitioners reported that Dr. Shore felt that H.W.'s symptoms were caused by stress, but they did "not agree or feel that she has stress." *Id.* As support, they noted that H.W. still was fatigued on vacation. *Id.* Upon a review of systems, Dr. Ramsey noted fatigue, abdominal pain, reduced appetite, nausea, dry skin/eczema, weakness, and heat/cold intolerance. *Id.* at 78–80. H.W.'s physical examination was normal, and Dr. Ramsey assessed her with amplified musculoskeletal pain, chronic lymphocytic thyroiditis,[14] chronic fatigue, and a chronic sore throat. *Id.* at 80.

H.W. presented to cardiologist Michael McConnell, M.D., on December 18, 2018, for an evaluation of syncope, dizziness, and headaches. Pet'r's Ex. 4 at 181. Dr. McConnell noted that H.W. previously saw his colleague, Dr. Campbell, for the same issues seven months prior. *Id.* H.W. reported that she continued "to get dizzy with position changes." *Id.* She explained that her "symptoms began in April [of 2018] when she passed out. In August [of 2018] she had a sore throat and abdominal pain. *Id.* She noted persistent issues with nausea, constipation, and abdominal pain. *Id.* H.W. reported that she had not suffered any additional fainting events since May of 2018, despite feeling dizzy several times per week. *Id.* She also indicated she had experienced problems with dizziness for the past six- to- twelve months. *Id.* at 182. Dr. McConnell's physical examination of H.W. was normal. *Id.* at 181–82. He opined that her symptoms appeared to be consistent with orthostatic intolerance. *Id.* at 183.

On January 9, 2019, H.W. established care at Nutritionally Yours, with Nancy Lefever, M.D., for symptoms of "a chronic flu like stomachache – [with an] empty stomach feel daily – even after she eats." Pet'r's Ex. 7 at 3, ECF No. 6-7. Petitioners reported that H.W.'s "nausea migrates and can move to her throat with a flu like feeling or soreness." *Id.* H.W.'s laboratory testing was negative for Lyme disease,[15] equivocal for Rocky Mountain Spotted Fever,[16] and

---

[14] Lymphocytic thyroiditis is also called Hashimoto's disease. It is defined as "a progressive type of autoimmune thyroiditis with lymphocytic infiltration of the gland and circulating antithyroid antibodies; patients have goiter and gradually develop hypothyroidism. It has a familial predisposition, usually affects women, and sometimes precedes the onset of Graves disease or is manifested after the major symptoms subside." *Dorland's* at 535.

[15] Lyme disease is "a recurrent, multisystemic disorder caused by the spirochete *Borrelia burgdorferi*; vectors for human infection are the ticks *Ixodes scapularis* and *I. pacificus.* It begins in most cases with erythema chronicum migrans (at least 5 cm in diameter), often accompanied by fatigue, malaise, chills, fever, headache, and regional lymphadenopathy, followed after several weeks or months by highly variable manifestations that may include musculoskeletal pain, involvement of the heart and the nervous system, and conjunctivitis and other eye abnormalities. Persistent infection, which may last for months or years, is characterized by arthritis of large joints and, in some cases, neurologic manifestations, including chronic axonal polyneuropathy, ataxia, and spastic paraparesis." *Dorland's* at 538.

[16] Rocky Mountain Spotted Fever is "an acute, infectious, sometimes fatal disease caused by *Rickettsia rickettsii*, usually transmitted by the bite of an infected tick . . . ; it occurs only in North and South America. It is characterized by sudden onset; chills; fever lasting 2 to 3 weeks; a cutaneous rash that appears early

positive for mycoplasma pneumonia[17] (both IgM and IgG). *Id.* at 36–38. She also had an elevated TSH. *Id.* at 39. H.W. returned to Dr. Lefever on February 13, 2019, reporting difficulties concentrating, sleep disturbances, watery eyes, weight loss, chest pain, joint pain in her shoulders, back, and legs, tingling in her hands and feet, and fatigue. *Id.* at 32. Petitioners reported that H.W. suffered from chronic sore throats for the past five years, and since receiving her HPV vaccine in August of 2018 "she has been sick with flu like symptoms at times, no sustained fever[,] and fatigue." *Id.* They noted that after extensive work ups with numerous specialists, her diagnosis is "depression with mild POTS." *Id.* Dr. Lefever assessed H.W. with a mycoplasma infection, gastrointestinal candidiasis,[18] generalized abdominal pain, and paresthesia.[19] *Id.* at 34.

H.W. returned to her pediatrician on May 20, 2019, for a two-day history of ear pain. Pet'r's Ex. 4 at 202. H.W. reported her one-year history of chronic sore throat, fatigue, and aches. *Id.* Petitioners stated that H.W. had been diagnosed with Lyme disease[20] and treated with antibiotics without improvement. *Id.* However, H.W.'s pediatrician wrote that she was "sure [H.W.] does not have Lyme disease," as she did not improve with antibiotics. *Id.* at 204. H.W.'s pediatrician opined that H.W. suffered from fibromyalgia.[21] *Id.* Her pediatrician noted H.W. had not received any of the recommended psychological care and that Petitioners were convinced her symptoms were caused by her HPV vaccine. *Id.* at 202.

On June 4, 2019, H.W. presented to infectious disease specialist Charles Huskins, M.D., at the Mayo Clinic. Pet'r's Ex. 8 at 223, ECF No. 6-8. H.W. reported that she was generally healthy until August of 2018. *Id.* at 224. She noted that the day before her well-child visit on August 20, 2018, she developed a sore throat and abdominal pain. *Id.* Petitioners reiterated H.W.'s medical history consistent with the record described above. *See id.* Dr. Huskins noted that numerous possible causes had been proposed for H.W.'s symptoms, including POTS, orthostatic intolerance, deconditioning, and functional behavior but none had been conclusive. *Id.* at 229. He further noted H.W.'s supposed Lyme disease diagnosis and wrote that Petitioners had "doubts about the validity of the Lyme disease diagnosis[.]" *Id.*

The same day, H.W. saw pediatrician Michael Farrell, M.D., reporting abdominal issues. *Id.* at 207–08. She indicated that she was no longer experiencing dizziness as a result of increasing fluids but had leg and chest pain and intermittent headaches. *See id.* Dr. Farrell noted that "[i]t does not appear that she ever had Lyme disease." *Id.* at 210. He suspected she suffered from an autonomic dysfunction, but "wonder[ed] about the possibility of fructose intolerance and/or an

---

and spreads from the limbs upwards onto the trunk and face; myalgias; severe headache; and prostration." *Dorland's* at 1651.

[17] Mycoplasma pneumonia is "a species that often causes inapparent infections or mild respiratory tract disease." *Dorland's* at 1473.

[18] Candidiasis is an "infection with a fungus of the genus *Candida*, especially *C. albicans.* It is usually a superficial infection of the skin or mucous membranes, although sometimes it manifests as a systemic infection or endocarditis; any form can become more severe in immunocompromised patients." *Dorland's* at 280.

[19] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *Dorland's* at 1383.

[20] H.W.'s testing for Lyme disease on January 9, 2019, was negative. Pet'r's Ex. 7 at 36.

[21] Fibromyalgia is "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." *Dorland's* at 703.

esophageal problem." *Id.* at 211. He wrote that H.W.'s overall presentation was consistent with hypermobility syndrome,[22] which "should not be regarded as the 'cause' of pain, but rather a variant in connective tissue that increases the risk for certain types of pain or dysautonomia." *Id.*

Two days later, on June 6, 2019, H.W. followed up with Dr. Huskins to review her laboratory testing. *Id.* at 60. Dr. Huskins noted that her testing was normal, there was no evidence of Lyme disease, numerous different viral titers were negative, and there was no evidence of an "active infection." *Id.* Dr. Huskins opined that H.W.'s illness in the fall of 2018 may have been an enterovirus[23] infection, "because this is the epidemic time of the year for this virus and her symptoms could have been consistent with this infection." *Id.* He wrote that the "immunologic screening tests d[id] not indicate any abnormality." *Id.*

The same day, H.W. underwent a tilt-table test that revealed "evidence of symptomatic orthostatic tachycardia[,] which can be seen in deconditioning, dehydration, venous pooling, constitutional trait, hyper-adrenergic states (including anxiety), and primary disorders of orthostatic intolerance." *Id.* at 81. Also on June 6, 2019, H.W. followed up with Dr. Farrell for additional laboratory results. *Id.* at 63. He noted that testing showed a fructose malabsorption, which was likely causing H.W.'s abdominal discomfort. *Id.* Dr. Farrell opined that her POTS and other symptoms may improve once H.W. addressed her fructose malabsorption through her diet. *Id.* He further noted H.W.'s low ferritin[24] level may explain some of her symptoms. *Id.*

During her fourteen-year well-child visit with her pediatrician on September 5, 2019, H.W. reported the same complaints. Pet'r's Ex. 4 at 285. Her pediatrician noted that "[m]ost of [H.W.'s] symptoms are related to her extreme anxiety . . . she should be started on medication [but Petitioners] and [H.W.] are afraid she is going to get even more tired than usual[.]" *Id.* at 288.

H.W. continued to receive care for the same complaints of abdominal pain and sore throats throughout 2019 and 2020.[25] *See id.* at 290–331, 341–44; *see also* Pet'r's Ex. 8 at 37. By

---

[22] Hypermobility syndrome is a subset of Ehlers-Danlos syndrome, which is defined as "an autosomal dominant form usually due to mutation in the *TNXB* gene (locus: 6p21.3), which encodes the extracellular matrix protein tenascin-XB. It is characterized by marked joint hyperextensibility, minimal skin manifestations, muscle fatigue and pain, premature osteoarthritis, and mitral valve prolapse or aortic root dilatation." *Dorland's* at 1828–29.

[23] Enterovirus is "a genus of viruses of the family Picornaviridae that preferentially inhabit the intestinal tract. Infection is usually asymptomatic or mild but may result in a variety of disease syndromes. Human enteroviruses were originally classified as polioviruses, coxsackieviruses, or echoviruses[.]" *Dorland's* at 626–27.

[24] Ferritin is "one of the chief forms in which iron is stored in the body; it occurs at least in the gastrointestinal mucosa, liver, spleen, bone marrow, and reticuloendothelial cells generally." *Dorland's* at 689.

[25] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the decision will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

8

September 8, 2020, H.W. also reported other symptoms, including difficulties walking due to severe leg pain and weakness, severe migraines, fatigue, night sweats, loss of appetite, skin rash, mouth sores, chest pain, rapid heart rate, painful urination, an irregular menstrual cycle, fainting, light headedness, numbness in her extremities, loss of concentration and balance, and depression. Pet'r's Ex. 8 at 37.

### III.   Parties' Arguments

### A.   Petitioners' Arguments

Petitioners maintain their complaint was brought in good faith and with a reasonable basis, "over and above Petitioners' statutory requirement of first filing in the [Program,]" prior to pursuing an action against Merck directly. Pet'r's Mot. for AFC at 1. Petitioners argue that they "[o]bviously" believe the HPV vaccine caused H.W.'s injuries because they opted out of the Vaccine Program to file a suit directly against the vaccine manufacturer. *Id.* at 3. Petitioners rely on the affidavit from Mrs. Wingerter attesting to her belief that the HPV vaccine harmed her child, along with a VAERS report reflecting "H.W.'s adverse event." *Id.*; *see also* Pet'r's Ex. 1 at 1, ECF No. 6-1; Pet'r's Ex. 2 at 2, ECF No. 6-2. They further rely on the principles set forth in *Di Roma* and *Grice* to establish that "good faith" exists because of their honest belief that H.W. suffered an adverse reaction to the vaccine at issue. Pet'r's Mot. for AFC at 2–3 (citing *Di Roma v. Sec'y of Health & Hum. Servs.,* No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993); *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (1996)).

Regarding reasonable basis, Petitioners maintain "H.W.'s medical chart supports the causal connection between vaccination and [the] injury claimed." Pet'r's Mot. for AFC at 3. Petitioners rely on the fact that H.W.'s symptoms appeared one week after her August 20, 2018 vaccination. *Id.* Petitioners further rely on various notations from H.W.'s treating physicians indicating reports from Petitioners that H.W.'s symptoms began after her HPV vaccination and their concern that her injuries were vaccine-related. *See id.* at 3–4. They also cite the HPV package insert that lists the requirements for establishing that an adverse reaction occurred. *Id.* at 4 (citing 21 C.F.R. § 201.57(c)(7)); *see also* Pet'r's Ex. 10, ECF No. 6-10. Petitioners further maintain that H.W.'s headache, nausea, dizziness, abdominal pain, and myalgia "are all listed in the Gardasil product insert as symptoms occurring after [the] Gardasil vaccination." Pet'r's Mot. for AFC at 5 (citing Pet'r's Ex. 10 at 9–10). They cite *Cottingham* and *James-Cornelius* to argue that the Federal Circuit has determined that product inserts are probative evidence supporting reasonable basis and "if a [p]etitioner has the same documented symptoms post[]vaccination that are reflected in that vaccination's product insert, there is a reasonable basis to believe there is a causal relationship between the vaccination and the occurrence of the documented symptoms." Pet'r's Mot. for AFC at 5 (citing *Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337 (Fed. Cir. 2020); *James-Cornelius v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374 (Fed. Cir. 2021)). Finally, Petitioners rely on medical literature to establish that H.W.'s diagnosis of autonomic dysfunction/POTS has been "well documented" as being triggered by the HPV vaccine. Pet'r's Mot. for AFC at 5 (citing Pet'r's Exs. 12–16). Petitioners cite the *Thomas* decision in their reply to Respondent's opposition to Petitioners' motion for final attorneys' fees and costs. Pet'r's Reply, Ex. A; *Thomas v. Sec'y of Health & Hum. Servs.*, No. 20-886V, 2021 WL 2389837 (Fed. Cl. Spec. Mstr. May 17, 2021). This decision overruled Respondent's objection to an award of fees and costs on the very arguments Respondent makes in this case. *See id.*

### B. Respondent's Argument

Respondent argues that Petitioners are not entitled to an award of attorneys' fees and costs because the claim lacked good faith and Petitioners have not established a reasonable basis for their claim. Resp't's Resp. at 15. Respondent maintains that "[i]t is apparent that the instant petition was brought solely to satisfy the statutory requirement to come through the Program, so that [P]etitioners could exit the Program and bring a civil suit against Merck." *Id.* He notes that Petitioners admit this in the petition and in their notice to withdraw said petition. *Id.* (citing Pet. at 1; Notice at 1; Pet'r's Mot. for AFC at 1). Respondent argues Petitioners did not bring this claim in good faith because they "instead filed the petition solely as a step towards their ultimate goal of bringing a cause of action against Merck directly." Resp't's Resp. at 16. Respondent asserts that the reimbursement for attorneys' fees and costs is essentially asking the Vaccine Trust Fund to subsidize Petitioners' civil suit against Merck, all while depriving Merck of the *quid quo pro* of a decision resolving their claim on the merits. *Id.* at 14.

Regarding reasonable basis, Respondent argues that "[P]etitioners' claims are unsubstantiated by H.W.'s medical records or a medical opinion." *Id.* at 17. Specifically, Respondent maintains that "given that many of H.W.'s symptoms appear to predate her August 20, 2018 HPV vaccination, none of her medical providers concluded that the HPV vaccine caused H.W.'s symptoms, and numerous alternative causes were identified in the records[.]" *Id.* at 19 (citing Pet'r's Ex. 4 at 53–69, 90, 122–24, 137, 152–54, 158, 169–70, 181–82, 288, 321; Pet'r's Ex. 8 at 60, 94, 207, 223–24, 233; Pet'r's Ex. 2 at 2; Pet'r's Ex. 3 at 6, ECF No. 6-3; Pet'r's Ex. 6 at 81).

Respondent further argues that the package insert of the HPV vaccine "does not mention any of the diagnoses provided [in H.W.'s case], POTS, amplified pain syndrome, fibromyalgia, a functional disorder, anxiety, depression, and fructose intolerance." Resp't's Resp. at 19–20. "Given that [P]etitioners [] argue H.W.'s headaches or abdominal pain are all part of POTS and autonomic dysfunction, a vaccine insert that makes no mention of POTS whatsoever cannot provide evidence of reasonable basis" for Petitioners' claim. *Id.* at 20.

In closing, Respondent stresses the potential strain on the Program if other petitioners followed a similar approach to bringing a claim simply to withdraw it:

> Congress's inclusion of the objective reasonable basis requirement in Section 15(e) of the Act evinces its intent to encourage petitioners' attorneys to perform fundamental due diligence, and pursue claims that have some basis in fact, science, and law. Enforcement of this intent has become all the more important in recent years as the Program faces an ever-burgeoning docket with limited resources. Each petition that is filed carries transaction costs for both the Program and the court. With a statutorily-limited number of Special Masters, the time and resources that must be devoted to disposing of cases with no reasonable basis that are brought before the court lacking good faith – cases which petitioner never intended to litigate before the court nor completely develop the record – inevitably reduces the court's ability to focus on meritorious claims, and delays compensation in those cases.

*Id.* at 21–22. Finally, Respondent argues that "[f]inding reasonable basis and good faith only thwarts the [P]rogram's goals and delays compensation in those cases where petitioners intend to develop the record and litigate their cases on the merits." *Id.* at 22.

## IV.   Legal Standard for Availability of Attorneys' Fees & Costs for Withdrawn Petitions

In establishing a system for compensation of vaccine-related injuries the Vaccine Act provides that "[t]he United States Court of Federal Claims and the United States Court of Federal Claims special masters shall, in accordance with this section, have jurisdiction over proceedings to determine if a petitioner under § 300aa-11 of this title is entitled to compensation under the Program and the amount of such compensation." § 12(a). The Vaccine Act was intended to facilitate compensation by providing "fast, informal adjudication, of no-fault injury claims within the office of special masters in lieu of traditional tort suits against vaccine manufacturers." *Bruesewitz v. Wyeth LLC,* 562 U.S. 223, 228 (2011). As Respondent correctly noted, "[t]he *quid pro quo*" for this no-fault Program "designed to stabilize the vaccine market, was the provision of significant tort-liability protection for vaccine manufacturers." *Id.* at 229. Accordingly, the Vaccine Act allows limited avenues for a petitioner to pursue civil actions against manufacturers. Pursuant to the Act, a petitioner *must* file a petition in the Court of Federal Claims and reject the resulting judgment as a prerequisite to seeking other available tort relief. *Id.* at 228; *see also* §§ 11(2)(A)(i), 21(a) (emphasis added).

Section 12(d)(3)(A)(ii) of the Vaccine Act provides that "[a] special master to whom a petition has been assigned shall issue a decision . . . as expeditiously as practicable but not later than 240 days . . . after the date the petition was filed." Further, Section 12(g) provides that if the special master fails to make a decision on the petition within the prescribed timeframe, the special master "shall notify the petitioner . . . that [they] may withdraw the petition under section 300aa-21(b)."

With regard to bringing an action against a vaccine manufacturer, section 11(a)(2)(A)(ii) of the Act provides that

> [n]o person may bring a civil action for damages or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a vaccine-related injury or death . . . unless a petition has been filed, in accordance with section 300aa-16 of this title, for compensation under the Program for such injury or death . . . and such person elects to withdraw such petition under section 300aa-21(b) of this title or such petition is considered withdrawn under such section.

In this case, Petitioners exited the Program pursuant to section 21(b) with the stated intention of filing a lawsuit against the vaccine manufacturer. To effectuate Petitioners' requested action, Vaccine Rule 10(d) provides that the special master may issue an order concluding proceedings in response to a petitioner's notice of withdrawal and "upon entry will be deemed a judgment for purposes of 42 U.S.C. § 300aa-15(e)(1)."

Under section 15(e)(1) of the Act, the "special master or the court may award an amount

of compensation to cover [a] petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought."

With Vaccine Rule 10(d) and section 300aa-15 of the Act in tandem, my order concluding proceedings in this case constitutes a judgment on this petition that does not award compensation. Thus, this case is only eligible for reasonable attorneys' fees and costs upon a showing that the petition was brought in good faith and with a reasonable basis.

Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice,* 36 Fed. Cl. at 121. Thus, so long as Petitioners had an honest belief that her claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Hum. Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Good faith is a subjective test, satisfied through subjective evidence. *Cottingham,* 971 F.3d at 1344.

Whereas "reasonable basis" is an objective standard. An analysis of reasonable basis requires more than just a petitioner's belief in her claim. *Turner,* 2007 WL 4410030, at *6–7. Instead, the claim must at least be supported by objective evidence – medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Hum. Servs.*, No. 14-804V, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015). A reasonable basis determination is based on a totality of the circumstances inquiry that can be satisfied by reviewing the factual, medical, and jurisdictional support for a claim.[26] *See Cottingham*, 971 F.3d at 1344–45; *Chuisano v. Sec'y of Health & Hum. Servs*., 116 Fed. Cl. 276, 288 (2014). The amount of objective evidence that satisfies reasonable basis is more than a scintilla of evidence but less than preponderant evidence. *Cottingham*, 971 F.3d at 1344–45 (clarifying that "the failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion."). Thus, petitioners must offer more than an unsupported assertion that a vaccine caused the injury alleged. *See, e.g.*, *Cortez v. Sec'y of Health & Hum. Servs.*, No. 09-176V, 2014 WL 1604002, at *5 (Fed. Cl. Spec. Mstr. Mar. 26, 2014); *McKellar v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 297, 303–04 (2011). Objective medical evidence, including medical records even where the records provide only circumstantial evidence of causation, can support a showing of reasonable basis. *Cottingham,* 971 F.3d at 1346. Further, "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has reasonable basis." *James-Cornelius,* 984 F.3d at 1379 (citing *Cottingham,* 971 F.3d at 1346).

Regarding affidavits, "[t]he Federal Circuit explained that 'the patient's or a parent's testimony may be the best, or only, direct evidence of medical symptoms or events.'" *James-Cornelius,* 984 F.3d at 1379. The Federal Circuit "reject[ed] the Special Master's broad pronouncement that petitioners' affidavits are categorically 'not objective' for purposes of evaluating reasonable basis[]" and held that a petitioner's "medical records may [] serve as important corroborating evidence for evaluating testimony's credibility[.]" *Id.* at 1379–81. Thus,

---

[26] The jurisdictional support for Petitioners' claim is not at issue in this case and therefore will not be addressed.

special masters cannot broadly categorize all petitioner affidavits as subjective evidence or completely refuse to consider a petitioner's sworn statements when evaluating reasonable basis. *See id.* (holding that factual testimony, when corroborated by medical records and a package insert, can amount to relevant objective evidence for supporting causation). However, a petitioner's own statements cannot alone support reasonable basis, and special masters may make factual determinations as to the weight of evidence. *See, e.g.*, *Chuisano*, 116 Fed. Cl. at 286; *Foster v. Sec'y of Health & Hum. Servs.*, No. 16-1714V, 2018 WL 774090, at *3 (Fed. Cl. Spec. Mstr. Jan. 2, 2018); *Cottingham*, 971 F.3d at 1347. Indeed, a petitioner's "burden has been satisfied . . . where a petitioner has submitted a sworn statement, medical records, and [a] VAERS report which show that recovery is feasible." *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121 at *6 (Fed. Cl. 2018) (citing *Turner*, 2007 WL 4410030, at *6).

Recently in the Vaccine Program, there have been several HPV/autonomic dysfunction cases that have been presented by Mr. Andrew Downing, the same counsel who represents Petitioners in this case. Mr. Downing began resolving some HPV-related cases via motions to dismiss, explaining that the petitioners in those cases intended to reject the resulting judgment and pursue tort remedies directly against the vaccine manufacturer. *See, e.g.*, *Wagner on behalf of S.W. v. Sec'y of Health & Hum. Servs.*, No. 19-188V, 2020 WL 6554930, at *1 (Fed. Cl. Mstr. Oct. 14, 2020); *Otto v. Sec'y of Health & Hum. Servs.*, No. 16-1144V, 2020 WL 4719285 (Fed. Cl. Spec. Mstr. June 17, 2020); *McElerney v. Sec'y of Health & Hum. Servs.*, No. 16-1540V, 2020 WL 4938429, at *1 (Fed. Cl. Spec. Mstr. July 28, 2020). Good faith and reasonable basis were found in such cases, under fairly similar factual and procedural circumstances. *See id.*

V.    **Analysis**

A.    **Good Faith**

In the case Petitioners cite in their reply, *Thomas*, the special master explained that the Vaccine Act specifically creates a mechanism for petitioners to withdraw from the Program and pursue civil litigation. *Thomas*, 2021 WL 2389837, at *3–4. Further, the special master explained that complying with the statute to withdraw a petition to pursue civil litigation is not inconsistent with the purpose of the Vaccine Act. *See id.* While decisions of special masters are not binding on my decision, I agree with my colleagues here. Filing the petition with the Court of Federal Claims' special masters and utilizing the 240-day withdrawal option is a creation of the Vaccine Act. Thus, it cannot be said that a petitioner utilizing this statutorily created withdrawal option is acting contrary to the Vaccine Act. Congress preserved that right while requiring that a case initially be filed in the United States Court of Federal Claims, as this one was, but allowed petitioners to withdraw a claim after 240 days if the case had not been resolved by a special master by that time, or to reject a judgment of the Court and pursue litigation against the manufacturer. In fact, the Court is required to give notice to petitioners of the right to dismiss after 240 days when the case is not concluded by that time. Petitioners in this case intended to pursue tort litigation but followed the express requirement of the Act to first file their petition in this Court along with medical records to substantiate their claim of their child's medical injury, which they believed was caused by the Gardasil vaccine.

Further, Respondent does not cite to any authority supporting his assertion that good faith

requires "an attempt to adjudicate the merits of the claim." Instead, this assertion is incompatible with both the statute, which provides a mechanism for a petitioner to withdraw her claim after a certain period of time, and the legal framework of good faith claims brought before this Court. Applying Respondent's argument and logical conclusion would not only increase attorneys' fees and costs over time, but it would also cause further delay in adjudicating other claims before the Court. Petitioners argue that the meaning of good faith is well-settled and refers to their belief that the HPV vaccine caused H.W.'s injury, and not their intention concerning litigation. *See* Pet'r's Reply at 6–7 (citing *Di Roma*, 1993 WL 4961981, at \*1). Petitioners' stated intention to file suit directly against Merck in a different forum is consistent with a genuine belief that a vaccine-caused injury has occurred. Petitioners further submitted a VAERS report documenting their honest belief that the HPV vaccine caused H.W.'s injuries. *See* Pet'r's Ex. 2. I therefore find that Petitioners' petition was filed in good faith.

**B. Reasonable Basis**

In discussing the reasonable basis requirement in *Cottingham*, the Federal Circuit stressed the *prima facie* petition requirements of section 300aa-11(c)(1) of the Vaccine Act. 971 F.3d at 1345–46. Specifically, the petition must be accompanied by an affidavit and supporting documentation showing that the vaccinee:

(1) received a vaccine listed on the Vaccine Injury Table;
(2) received the vaccination in the United States, or under certain stated circumstances outside the United States;
(3) sustained (or had significantly aggravated) an injury as set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;
(4) experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and
(5) has not previously collected an award or settlement of civil action for damages for the same injury.

*See id.* In this case, Respondent's objection to reasonable basis is rooted in element three, in that Petitioners' claim is not supported by evidence that demonstrates H.W. sustained a vaccine-related injury. Resp't's Resp. at 17. Respondent further asserts that H.W.'s symptoms predated her August 20, 2018 HPV vaccination. *Id.* These issues are related to vaccine causation and whether Petitioners have provided preponderant evidence establishing entitlement to compensation. However, the burden of proof to establish a reasonable basis for attorneys' fees and costs is "more than a mere scintilla but less than a preponderance of proof." *Cottingham,* 971 F.3d at 1346. Indeed, the Federal Circuit has explained that an expert or treating physician's opinion on causation is not required for reasonable basis. *See id.* (finding that medical records paired with the vaccine's package insert constituted objective medical evidence which may support finding a reasonable basis of causation). Further, for purposes of establishing reasonable basis for a claim, "[m]edical records can support causation even where the records provide only circumstantial evidence of causation." *Id.*; *see also James-Cornelius*, 984 F.3d at 1382.

In this case, H.W.'s medical records alone do not establish a reasonable basis for Petitioners' claim. While H.W.'s medical records do contain mentions of her HPV vaccination in relation to the onset of her symptoms, such concerns were all reported by Petitioners themselves

14

and are limited to the fact that H.W.'s symptoms occurred following vaccination. In fact, H.W. presented to the Children's Hospital of Atlanta on November 13, 2018, and the notation reflects that the "[p]atient reports she had the HPV vaccine in [August of 2018] and her symptoms began afterwards. Her parents are concerned that it was a vaccine reaction and have contacted the CDC about it but did not hear anything definitive that her symptoms were caused by the vaccine." Pet'r's Ex. 6 at 76. A similar note recounts H.W.'s history and indicates that her symptoms began "after receiving the HPV vaccination . . . ." *See id.* at 94. Petitioners similarly reported to H.W.'s pediatric infectious disease specialist on October 10, 2018, that they thought her symptoms were related to her HPV vaccination. Pet'r's Ex. 4 at 169. They further reported to Dr. Lefever on February 13, 2019, that since H.W.'s vaccination, she experienced flu-like symptoms. Pet'r's Ex. 7 at 32. Such notations are nothing more than indications that H.W.'s symptoms allegedly began at some point in time after her August 20, 2018 vaccination and that Petitioners believed her symptoms were vaccine-related. They do not reach the issue of whether H.W.'s treaters actually believed that her vaccination was the cause of her injuries.

In fact, many of H.W.'s treaters actually wrote that they did not believe that her HPV vaccination was the cause of her injuries. *See, e.g.*, Pet'r's Ex. 4 at 154, 171; Pet'r's Ex. 8 at 63. Several of her treaters proffered alternative explanations for H.W.'s symptomology, including the stress associated with acclimating to a competitive school, immobility associated with her ongoing symptoms, amplified musculoskeletal pain, fibromyalgia, a fructose intolerance, low ferritin levels, and functional anxiety and depression. *See* Pet'r's Ex. 4 at 158, 167, 204, 288; Pet'r's Ex. 6 at 80; Pet'r's Ex. 8 at 60, 63, 81, 211.

As further support for the fact that H.W.'s treaters did not believe her HPV vaccination caused her injury, her medical record contains notations showing that H.W.'s symptoms predated her August 20, 2018 vaccination. For example, on August 17, 2016, approximately two years prior to the vaccination at issue, H.W. presented to her pediatrician for ear and throat pain. Pet'r's Ex. 4 at 44, 53–54. Approximately one week later, H.W. reported the same symptoms, with the addition of abdominal pain. *Id.* at 54, 57, 59. Similarly, on August 7, 2017, approximately one year later and one year prior to the vaccine at issue, H.W. presented to her pediatrician with complaints of back and leg pain. *Id.* at 81, 84, 90. Six months later, on December 14, 2017, H.W. complained of throat and abdominal pain, along with a lack of energy. *Id.* at 86, 90. Three months before her HPV vaccination, on May 1, 2018, H.W. reported experiencing an episode of syncope with dizziness and blurred vision. *Id.* at 107–08, 110, 112, 119. In fact, during H.W.'s first post-vaccination appointment with her pediatrician on August 24, 2018, H.W.'s treater noted that her symptoms of abdominal, throat, and ear pain began five- to- seven days prior to that visit and recur every summer. *Id.* at 137, 158. Dr. Shore noted on October 10, 2018, that he doubted the HPV vaccination was the cause of H.W.'s injuries because her abdominal pain began a week before she received the vaccine. *Id.* at 171. Such notations referencing the HPV vaccine alone therefore do not provide sufficient evidence for a reasonable basis for Petitioners' claim.

However, Petitioners submitted an affidavit, which represents direct evidence of the post-vaccination medical symptoms experienced by H.W. and is considered direct evidence of causation to support a reasonable basis for Petitioners' claim. *See James-Cornelius*, 984 F.3d at 1379–81. Indeed, Mrs. Wingerter noted that "[s]lowly throughout the week after [H.W.'s] vaccine, [she] began to feel a heavy fatigue set in. Her stomach felt nauseous and would not go away." Pet'r's Ex. 1 at 2. She explained that H.W. "could not get out of bed . . . felt exhausted,

weak, [had a] constant stomachache, [and] frequent discomfort in her throat." *Id.* In addition, Petitioners filed the package insert for the vaccine at issue. The package insert for the HPV vaccine explains that some recipients have suffered from nausea, dizziness, fatigue, oropharyngeal pain, and upper abdominal pain post vaccination. *See* Pet'r's Ex. 10 at 6. Such symptoms were reported by H.W. in the days following her August 20, 2018 vaccination, as described in Mrs. Wingerter's affidavit. H.W. reported the same symptoms to her pediatrician during her appointment four days post vaccination. Pet'r's Ex. 4 at 137. Respondent is correct that issues concerning onset and alternative causes would have been a hurdle for Petitioners in establishing entitlement to compensation. However, for the sake of establishing reasonable basis, Petitioners consistently described H.W.'s complaints of abdominal pain, dizziness, fatigue, and a sore throat as arising post vaccination in conjunction with a POTS diagnosis. When taken together, Petitioners' affidavit, vaccine package insert, and H.W.'s medical record establishes "more than a mere scintilla" of evidence to support a reasonable basis for Petitioners' claim.

## VI.   Attorneys' Fees & Costs

### A.   Legal Standard for Attorneys' Fees & Costs

Petitioners "[b]ea[r] the burden of establishing the hours expended, the rates charged, and the expenses incurred" are reasonable. *Wasson v. Sec'y of Health & Hum. Servs.,* 24 Cl. Ct. 482, 484 (1993). Counsel must submit fee requests that include contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service. *See Savin v. Sec'y of Health & Hum. Servs.,* 85 Fed. Cl. 313, 316–18 (2008). Adequate proof of the claimed fees and costs should be presented when the motion is filed. *Id.* at 484 n.1. The special master has the discretion to reduce awards *sua sponte*, independent of enumerated objections from the respondent. *Sabella v. Sec'y of Health & Hum. Servs.,* 86 Fed. Cl. 201, 208–09 (Fed. Cl. 2009); *Savin,* 85 Fed. Cl. 313, *aff'd* No. 99-537V, 2008 WL 2066611 (Fed. Cl. Spec. Mstr. Apr. 22, 2008).

### B.   Attorneys' Fees

Petitioners request reimbursement for attorneys' fees in the total amount of **$14,630.50**[27] for the work performed by their attorney, Mr. Andrew Downing, Ms. Courtney Van Cott and two paralegals that performed work on their case during 2020 and 2021. Pet'r's Mot. for AFC, Ex. A at 1–16. Mr. Downing requests a rate of $385.00 per hour for work performed on this case in 2020 and 2021, a rate of $275.00 per hour for work performed by Ms. Van Cott, and a rate of $135.00 per hour for work performed by two paralegals during the same time period. *See id.*

The requested rates have been previously awarded to Mr. Downing, Ms. Van Cott, and their paralegals by myself and other special masters and are consistent with the OSM Attorneys' Rate Fee Schedule. *See, e.g.*, *Colbath v. Sec'y of Health & Hum. Servs.*, No. 17-599V, 2021 WL 1120986, at *2 (Fed. Cl. Spec. Mstr. Feb. 23, 2021); *Antolick v. Sec'y of Health & Hum. Servs.,* No. 16-1460V, 2020 WL 524776, at *4 (Fed. Cl. Jan. 13, 2020); *Dreyer v. Sec'y of Health & Hum. Servs.*, No. 18-764V, 2019 WL 6138132, at *3 (Fed. Cl. Spec. Mstr. Oct. 29, 2019).

---

[27] This amount also includes the time spent in Petitioners' supplemental attorneys' fees motion. *See* Pet'r's Supp. Mot. for AFC, Ex. A.

### C.  Hours Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera v. Sec'y of Health & Hum. Servs.,* 515 F.3d 1343, 1348 (Fed. Cir. 2008). Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that in [her] experience and judgment, [is] reasonable for the work done." *Saxton ex rel. Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1522 (Fed. Cir. 1993). In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen v. Sec'y of Health & Hum. Servs.,* 102 Fed. Cl. 719, 728–29 (2011) (affirming the special masters' reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Hum. Servs.,* 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction of attorney and paralegal hours).

Petitioners have provided a detailed invoice outlining the work performed by each person who worked on their case during 2020–2021. Based on the provided invoices, Mr. Downing performed a total of 22.3 hours of work; Ms. Van Cott performed a total of 10.2 hours of work; one paralegal, Ms. Avery, performed 17.7 hours of work; and another paralegal, Mr. Cain, performed 6.3 hours of work. The tasks for which the attorneys and paralegals billed are consistent with tasks necessary when pursuing a claim in the Vaccine Program but seem to be at least somewhat excessive if the overall intention was to dismiss this case and pursue a third-party litigation outside of the Program. While I recognize that attorney work is necessary to meet the minimum requirements of the statute by requesting, reviewing, and filing medical records, the amount of such attorney work should be limited when the intent is to withdraw the petition and pursue alternative litigation. *See Nyboer v. Sec'y of Health & Hum. Servs.*, No. 21-1010V, 2022 WL 601753, at *10 (Fed. Cl. Spec. Mstr. Jan. 27, 2022). I therefore find that a slight reduction is necessary due to entries that appear to be duplicative and excessive. For example, on September 18, 2020, paralegals Ms. Avery and Mr. Cain reviewed and analyzed medical records from Sandy Springs Pediatrics and updated their medical records intake form. Pet'r's Mot. for AFC, Ex. A at 6, 10. The same occurred on September 22, 2020, for records received from East Cobb Pediatrics. *See id.* Based on the invoices, it appears that duplicative billing for the same services occurred at least three more times after medical records were obtained from various providers. *Id.* at 7, 8, 10, 11. In this case, the majority of Mr. Downing and Ms. Van Cott's time expenditure on this case was directed on analyzing H.W.'s medical records, while when filing the petition, Mr. Downing had discussed "opting out to sue Merck directly." *Id.* at 1. This time spent by both attorneys analyzing the medical records, when paralegals were also analyzing the same medical records is unreasonable. *See, e.g., id.* at 2, 3, 8, 11 (wherein both attorneys and both paralegals billed for reviewing medical records from GI Care for Kids on November 4, 2020). Reviewing medical records is not necessarily *per se* unreasonably excessive, however, when more than one paralegal is doing the same work and updating the same internal record keeping device, it becomes duplicative. This is especially true when a petitioner already knows that they will be opting out of the Program to pursue third party litigation.

While acknowledging that the Vaccine Act permits Petitioners to exit the Program to bring a civil action outside of the Program, Petitioners' attorney should be wary of excessive and duplicative billing, even when trying to complete the substantive work to establish a reasonable basis. In this case, at the time of filing the petition, Petitioners noted their decision to pursue litigation against Merck. *See* Pet. at 1. Petitioners also discussed this option during their first

meeting with counsel prior to filing their case in the Program. Pet'r's Mot. for AFC, Ex. A at 1. Recognizing that the Act requires medical records and supportive documentation be filed in the Program to establish good faith and reasonable basis, petitioners intending to exit the Program should attempt to minimize the time billed for analysis of the medical records, which are ultimately being used for proof in a case in an alternative forum. Accordingly, I will reduce the attorneys' fees by fifteen percent, or $2,194.58, for duplicative billing. *See Broekelschen,* 102 Fed. Cl. at 728–29. Therefore, Petitioners are awarded **$12,435.92** in attorneys' fees.

### D. Attorneys' Costs

Like attorneys' fees, a request for reimbursement of costs must be reasonable. *Perreira v. Sec'y of Health & Hum. Servs.,* 27 Fed. Cl. 29, 34 (Fed. Cl. 1992). In this case, Petitioners are requesting a total of **$745.51** in attorneys' costs for their counsel Andrew Downing. Petitioners are seeking reimbursement for costs such as filing the petition, obtaining medical records, and postage. Petitioners have provided adequate documentation supporting these costs and they are reasonable. As such, Petitioners are awarded the requested costs in full.

### VII. Conclusion

In conclusion with the above, Petitioners' motion for attorneys' fees and costs is hereby **GRANTED**, and Petitioners are awarded the following award:

| | |
|---|---|
| Final Attorneys' Fees Requested | $14,630.50 |
| (Reduction to Fees) | -   $2,194.58 |
| **Final Attorneys' Fees Awarded** | **$12,435.92** |
| | |
| Final Attorneys' Costs Requested | $745.51 |
| (Reduction of Costs) | -   $0.00 |
| **Final Attorneys' Costs Awarded** | **$745.51** |
| | |
| **Final Attorneys' Fees and Costs** | **$13,181.43** |

Accordingly, I award a lump sum in the amount of **$13,181.43** to be issued in the form of a check payable jointly to Petitioners and Petitioners' counsel, Andrew Downing, for final attorneys' fees and costs.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court **SHALL ENTER JUDGMENT** in accordance with the terms of the above Decision.[28]

**IT IS SO ORDERED.**

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master

---

[28] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.